EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Wanda López Delgado y otros<br><br>Recurridos<br><br>v.<br><br>Dr. Orlando Cañizares y otros<br><br>Peticionarios | Certiorari<br><br>2004 TSPR 160<br><br>162 DPR \_\_\_\_ |

Número del Caso: CC-2001-893
                 CC-2001-895
                 CC-2001-897

Fecha: 5 de octubre de 2004

Tribunal de Circuito de Apelaciones:

                 Circuito Regional I de San Juan

Juez Ponente:
                 Hon. Ángel González Román

Abogados de la Parte Peticionaria:

                 Lcdo. Ángel R. De Corral Juliá
                 Lcdo. Juan C. Limardo Defendini
                 Lcdo. Igor J. Domínguez
                 Lcdo. José A. González Villamil

Abogado de la Parte Recurrida:

                 Lcdo. Ulpiano Falcón Matos


Materia: Daños y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda López Delgado y otros

     Recurridos

        v.

                        CC-2001-893     Certiorari

Dr. Orlando Cañizares y otros     CC-2001-895

                        CC-2001-897

     Peticionarios

Opinión del Tribunal emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 5 de octubre de 2004.

Mediante el recurso ante nos, los peticionarios, Las Américas Ambulatory Surgical Center, Inc., el doctor Orlando Cañizares Baquero, Seguros Triple S, Inc., y el Sindicato de Aseguradores para la Suscripción Conjunta de Seguros de Responsabilidad Profesional Médico-Hospitalaria (SIMED), solicitan de esta Curia la revocación de una Sentencia dictada por el entonces Tribunal de Circuito de Apelaciones el 27 de septiembre de 2001, revocando sendas sentencias emitidas por el Tribunal de Primera Instancia, en las que se desestimó la demanda en daños y perjuicios presentada por la señora Wanda López Delgado, y otros, aquí demandantes recurridos, en contra de

los aquí peticionarios. El tribunal intermedio apelativo concluyó que los demandantes lograron demostrar, mediante prueba pericial, los elementos requeridos para configurar una acción por impericia médica, al amparo del Artículo 1802 del Código Civil.[1] Veamos el cuadro fáctico que da lugar al caso ante nos.

I

La señora Wanda López Delgado, aquí demandante recurrida, padecía de una condición de hipertrofia mamaria bilateral la cual le ocasionaba fuertes dolores de espalda. Por razón de ello, le fue recomendado por su médico internista, doctor Rafael Ruiz, que se sometiera a una mamoplastía o cirugía de reducción de senos. A esos fines, la señora López Delgado fue referida al doctor Orlando Cañizares, quien es especialista en cirugía cosmética y reconstructiva.

El 13 de diciembre de 1991, la señora López Delgado y su esposo visitaron por primera vez la oficina del doctor Cañizares. Dicho facultativo les explicó todo lo relacionado al procedimiento de reducción de senos, sus consecuencias y riesgos. El 21 de febrero de 1992, la señora López Delgado y su esposo, acudieron nuevamente a la oficina del doctor Cañizares. En esa ocasión, la señora López Delgado firmó el documento de consentimiento[2] y la intervención quirúrgica quedó pautada para el 2 de marzo de 1992.

Como parte del proceso preoperatorio, el doctor Cañizares ordenó un examen de "Complete Blood Count" (CBC), un urinálisis, "PT" y "PTT" los cuales arrojaron resultados normales. Según el "CBC" su hemoglobina estaba normal alta (14.5 gramos con hematrocritos de 42.3). La señora López Delgado padecía de una condición de hipertensión (presión alta) la cual estaba siendo tratada con los medicamentos Vasotec y Moduretic durante los seis

---

[1]  31 L.P.R.A sec. 5141.

[2]  Caso Núm. CC-01-895, Apéndice del recurso de *certiorari*, pág 150.

(6) a ocho (8) meses previos a la operación, por lo que su condición se encontraba controlada. Luego de estudiar el resultado de las pruebas realizadas, y de su completa evaluación, el doctor Rosendo Vela Piñero, anestesiólogo, determinó que la señora López Delgado estaba en condiciones de someterse al procedimiento quirúrgico.

El 2 de marzo de 1992 se llevó a cabo en forma ambulatoria la intervención quirúrgica de reducción de senos de la señora López Delgado. Dicho procedimiento requirió anestesia general endotraqueal con mascarilla y el anestesiólogo a cargo fue el doctor Enrique Sanz Valdés. La administración de la anestesia comenzó a las siete y cincuenta de la mañana (7:50 a.m.) y la cirugía veinte (20) minutos más tarde, o sea, a las ocho y diez de la mañana (8:10 a.m.). Durante la intervención quirúrgica, el doctor Cañizares removió una cantidad sustancial de tejido de cada seno (dos libras del seno derecho y una libra y quince onzas del seno izquierdo). Se le administró, además, a la señora López Delgado, 3,000cc de suero intravenoso. Al concluir la operación, el doctor Cañizares cerró las heridas y aplicó unos vendajes gruesos y abultados en ambos senos. La intervención quirúrgica culminó a las nueve y cincuenta y cinco de la mañana (9:55 a.m.) y el efecto de la anestesia se disipó a las diez y diez de la mañana (10:10 a.m.). Es decir, el procedimiento tuvo una duración de una hora (1) y cuarenta y cinco (45) minutos y la anestesia un total de dos (2) horas.

Durante el procedimiento no se presentaron complicaciones con excepción de dos (2) periodos de hipotensión (presión baja), durante la anestesia, los que fueron descritos por los peritos de los demandados como moderados y cortos, y como un efecto esperado durante una anestesia general.[3] Sin embargo, el perito de la

---

[3] Íd., pág. 236.

señora López Delgado adscribió a dichos periodos de hipotensión un carácter severo.

Luego de terminada la operación, la señora López Delgado fue llevada a la sala de recuperación, donde se le administró 500cc de líquido intravenoso. A las diez y cuarenta de la mañana (10:40 a.m.) la señora López Delgado fue al baño a orinar y más adelante toleró adecuadamente la ingesta de café. A las diez y cincuenta de la mañana (10:50 a.m.) la enfermera de sala de recuperación, señora Ana M. García Balasquide, notó que el vendaje del seno derecho tenía sangre, por lo que procedió a reforzar el mismo y así lo anotó en el récord.[4] La última medida de presión arterial que se le tomó a la señora López Delgado fue a las once de la mañana (11:00 a.m.). De acuerdo con el testimonio de la enfermera, señora Ana Matilde García, y del doctor Sanz, los signos vitales de la señora López Delgado permanecieron constantes, estables y dentro de los límites normales en todo momento durante su estadía en sala de recuperación.[5]

Así las cosas, la señora López Delgado fue dada de alta por el doctor Sanz a las doce y diez del mediodía (12:10 p.m.) del mismo día de la operación. Le prescribieron analgésicos y antibióticos y le impartieron instrucciones de acudir el miércoles 4 de marzo de 1992, a las dos de la tarde (2:00 p.m.), a la oficina del doctor Cañizares.

Con el fin de seguimiento sobre el estado de los pacientes de cirugía ambulatoria durante las primeras veinticuatro (24) horas postanestesia, el martes 3 de marzo de 1992, a las siete y treinta y ocho de la mañana (7:38 a.m.), la enfermera señora M. Maldonado llamó por teléfono a la señora López Delgado. Su esposo atendió la

---

[4] Íd. pág. 166; Transcripción de la vista en su fondo, Caso Núm. CC-01-897, Apéndice del recurso de *certiorari*, pág. 666;

[5] Transcripción de la vista en su fondo, supra, pág. 700.

llamada y le informó a la enfermera que ésta se sentía bien y así se anotó en el record.[6]

El 4 de marzo de 1992 la señora López Delgado acudió a su primera cita postoperatoria en la oficina del doctor Cañizares. El referido doctor removió los vendajes, los cuales estaban secos, y colocó un ajustador especial. Se le extendió una segunda cita postoperatoria para el 6 de marzo de 1992. El doctor Cañizares anotó en el récord que la paciente sentía debilidad y náuseas ocasionales.[7] La señora López Delgado declaró haber informado al doctor Cañizares que tenía "el pie izquierdo como al revés." Éste negó, que en ese momento, ella le hubiese comunicado tal cosa.

El doctor Cañizares estimó que la debilidad o "flojera" que sentía la paciente se debía a que la hemoglobina pudo haberle bajado por causa de la operación, por lo que consideró recetarle la ingesta de hierro. No obstante, entendió que era mejor posponer tal prescripción para la próxima semana para así evitar un posible estreñimiento.[8]

Al día siguiente, jueves 5 de marzo de 1992, la señora López Delgado llamó a la oficina del doctor Cañizares, indicando que sentía un fuerte dolor de cabeza y tenía dificultades para mover el lado izquierdo de su cuerpo. Éste ordenó que la paciente fuera traída de inmediato a su oficina. Esa tarde, la señora López Delgado y su esposo acudieron al consultorio del doctor Cañizares, quien ante el cuadro indicativo de un evento cerebrovascular, contactó al doctor Ayala Cuervos, internista del Hospital Hermanos Meléndez, y le refirió a la señora López Delgado. Ésta fue admitida esa tarde al referido hospital. El doctor Ayala Cuervos

---

[6] Récord de Las Américas Ambulatory Surgical Center, Caso Núm. CC-01-895, Apéndice del recurso de *certiorari*, pág. 168.

[7] Íd., pág. 140; Transcripción de la vista en su fondo, supra, pág 524.

[8] Caso Núm. CC-01-895, Apéndice del recurso de *certiorari*, pág. 140.

ordenó los exámenes "CBC" y "CT Scan." El "CBC" reveló hemoglobina de 7.1 gramos y hematocrito en 20.7. Los médicos del Hospital Hermanos Meléndez determinaron que la paciente tuvo una hemorragia postoperatoria interna, lenta, insidiosa y profusa con perdida de siete (7) unidades de sangre, por lo que se desarrolló una anemia severa. El "CT Scan" reveló, además, que la señora López Delgado sufrió un infarto cerebral isquémico grande que se extiende del lóbulo temporal al área parietal de su cerebro (lado derecho). Dicho trauma cerebrovascular le ocasionó una parálisis o hemiplegia en el lado izquierdo de su cuerpo y un impedimento permanente de setenta y dos porciento (72%) de la totalidad de su cuerpo, lo que se traduce a un cien porciento (100%) de incapacidad para realizar actividades que generen ingresos.[9]

La señora López Delgado, su esposo y la sociedad legal de gananciales compuesta por ambos presentaron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda en daños y perjuicios por alegada impericia médica del doctor Cañizares, Las Américas Ambulatory Surgical Center, su aseguradora SIMED, el doctor Sanz y su aseguradora Triple S. Alegaron en la demanda que todas las anteriores partes eran responsables solidariamente del daño cerebral sufrido por la demandante. Arguyeron que su negligencia consistió en no haberse tomado un historial adecuado de la paciente previo a la cirugía; no haberse realizado las pruebas de laboratorio que eran de rigor; haberse practicado una cirugía mayor en una clínica sin las facilidades para observación postoperatoria; no haberse cerciorado si la paciente estaba en adecuadas condiciones físico médicas para ser sometida a la intervención quirúrgica en cuestión; no haberle tomado a la

---

[9] Véase: Récord Hospital Hermanos Meléndez, Íd., págs. 176-204.

paciente un verdadero consentimiento informado; y no haber tomado en consideración que la paciente padecía de presión arterial alta.[10]

Todas las partes demandadas contestaron la demanda, negando las alegaciones imputadas.[11] Así las cosas, se llevó a cabo un amplio descubrimiento de prueba y se celebraron vistas evidenciaras en su fondo los días 21, 22 y 23 de julio de 1999 y el 2 y 3 de noviembre de 1999.

La prueba de los demandantes consistió en los testimonios de la señora López Delgado, su esposo, el doctor Cañizares y el doctor Luis R. Soltero Harrington, perito cirujano. La prueba de los codemandados doctor Cañizares y su aseguradora, consistió de los testimonios del propio doctor Cañizares y el perito doctor José M. Suárez González. Por su parte, Triple S presentó el testimonio de sus asegurados, doctor Sanz Valdés y doctor Vela Piñero, y, además, presentó el testimonio de la enfermera, señora Ana Matilde García Balasquide, y del doctor Raúl A. Porro Vizcarra, perito anestesiólogo. Los informes periciales y los récords médicos fueron presentados por ambas partes y admitidos en evidencia.

Luego de que la parte demandante culminara con la presentación de su prueba, los codemandados Las Américas Ambulatory Surgical Center, Inc., y su aseguradora SIMED presentaron una moción de desestimación bajo la Regla 39.2 (c) de Procedimiento Civil. Alegaron que no se había establecido por la prueba de la parte demandante un caso de responsabilidad hospitalaria. El 2 de diciembre de 1999, el Tribunal de Primera Instancia acogió la referida moción de desestimación y emitió sentencia parcial desestimando la demanda en cuanto a Las Américas Ambulatory Surgical Center, Inc. y su compañía aseguradora, al entender que,

---

[10] Íd., págs. 34-38.

[11] Íd., págs. 39-51.

en efecto, no se había establecido por la prueba de la parte demandante un caso de responsabilidad hospitalaria en su contra.[12]

El 31 de enero de 2000, el Tribunal de Primera Instancia desestimó la demanda en cuanto al resto de las partes al entender que la prueba presentada por la parte demandante no estableció negligencia alguna, toda vez que el tratamiento ofrecido a la señora López Delgado cumplió con las normas de la buena práctica médica. Intimó, además, que los traumas cerebrovasculares pueden y suelen ocurrir sin que medie un acto negligente. Específicamente dispuso lo siguiente:

> Aún cuando la condición de la demandante era una que nos impresionó, tanto por su edad como por las limitaciones que presenta y ello a su vez impactó nuestro ánimo, es nuestro deber concluir y así hoy lo hacemos que como cuestión de derecho, la parte demandante no estableció qué normas de la buena práctica médica fueron violentadas por ninguno de los médicos.[13]

Inconforme con las sentencias emitidas por el Tribunal de Primera Instancia, la parte demandante recurrió al Tribunal de Apelaciones. Mediante sentencia emitida el 27 de septiembre del 2001, el foro intermedio apelativo revocó las sentencias dictadas por el Tribunal de Primera Instancia.[14] El Tribunal de Apelaciones le dio **entero crédito** al testimonio pericial del doctor Soltero Harrington y concluyó que, contrario a lo determinado por el Tribunal de Primera Instancia, la señora López Delgado estableció con prueba pericial los elementos requeridos por el Art. 1802 del Código Civil[15] para configurar una acción de impericia médica, por lo que responsabilizó a todas las partes demandadas por los daños por ella sufridos.

---

[12] Íd., págs. 91-97.

[13] Íd., págs. 100-111.

[14] Íd., págs. 378-400.

[15] 31 L.P.R.A. sec. 5141.

Insatisfechos con dicha determinación los demandados recurren ante nos mediante sendos recursos de *certiorari*. El codemandado, doctor Cañizares, y su aseguradora SIMED, alegaron, en su petición de *certiorari,* lo siguiente:

> Al revocar la Sentencia dictada por el Tribunal Superior de San Juan, incurrió el Tribunal de Circuito de Apelaciones en error, prejuicio y parcialidad.
>
> Al revocar la Sentencia dictada por el Tribunal Superior de San Juan y encontrar que existe responsabilidad, incurrió en error el Tribunal de Circuito de Apelaciones, ya que no se probaron los elementos necesarios.
>
> Erró el Honorable [sic] Tribunal de Circuito de Apelaciones al sustituir su criterio por el del Tribunal de Instancia sin ninguna base o razón alguna.[16]

Por su parte, Seguros Triple S, Inc., como aseguradora del doctor Sanz, alegó en su escrito de *certiorari* lo siguiente:

> Erró el Honorable [sic] Tribunal de Circuito de Apelaciones al sustituir los criterios del Tribunal de Primera Instancia y determinar primero, que todas las partes demandadas responden por los daños sufridos por la parte demandante-recurrida y segundo, que la demandante-recurrida estableció los elementos de causa, causalidad y daño requeridos por el Artículo 1802 del Código Civil, 31 LPRA § 5141, para configurar una acción de impericia médica.[17]

Las Américas Ambulatory Surgical Center, Inc., y su aseguradora SIMED, alegaron que el Tribunal de Apelaciones incurrió en la comisión de los errores siguientes:

> Erró el Tribunal de Circuito de Apelaciones al no darle validez a la apreciación de la prueba realizada por el Tribunal de Primera Instancia en ausencia total de que las determinaciones de hecho fuesen claramente erróneas, arbitrarias y
>
> parcializadas o que no responden al balance más racional, justiciero y

---

[16] Caso Núm. CC-01-895, Solicitud de *certiorari*, pág. 4.

[17] Caso Núm. CC-01-897, Solicitud de *certiorari*, pág. 4.

> jurídico de la totalidad de la evidencia admitida por el tribunal.
>
> Erró el Tribunal de Circuito de Apelaciones al imponerle responsabilidad a Las Américas Surgical Center Inc. y su compañía aseguradora SIMED sin darles la oportunidad de contrainterrogar y/o presentar como suyos a los testigos y peritos utilizados por los codemandados durante su turno de presentación de pruebas luego de que se había desestimado la demanda en contra de las partes aquí comparecientes.[18]

El 21 de febrero de 2003, denegamos expedir el recurso de *certiorari* presentado por Las Américas Ambulatory Surgical Center, Inc., y su aseguradora SIMED y la petición de *certiorari* del doctor Cañizares y su aseguradora SIMED. Expedimos, sin embargo, el recurso de *certiorari* presentado por Seguros Triple S, como aseguradora del doctor Sanz.

El 7 de marzo de 2003, el doctor Cañizares y su aseguradora presentaron una oportuna moción de reconsideración de la resolución de este Tribunal denegando su petición de *certiorari.* Los demandantes recurridos presentaron oportunamente su oposición a dicha moción de reconsideración. De igual forma, los peticionarios Las Américas Ambulatory Surgical Center, Inc., y su aseguradora presentaron, el 11 de marzo de 2003, una oportuna moción de reconsideración. Los demandantes recurridos presentaron, a su vez, su oposición a dicha moción de reconsideración. Mediante resolución emitida el 28 de marzo de 2003 acogimos las referidas mociones de reconsideración y el 2 de mayo de 2003 consolidamos los recursos de *certiorari* presentados por los demandados recurrentes.

Examinadas las comparecencias de las partes y los autos del presente caso, nos encontramos en posición de resolver.

II

---

[18] Caso Núm. CC-01-893, Solicitud de *certiorari,* pág. 5.

La responsabilidad civil por actos de mala práctica de la medicina debido a la impericia o negligencia de un facultativo emana del Artículo 1802 del Código Civil.[19] Dicho artículo dispone que, el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. De esta forma, para imponer responsabilidad civil a un médico por actos de mala práctica al amparo del referido estatuto, es necesario la concurrencia de los siguientes requisitos: (1)realidad del daño sufrido; (2)un acto u omisión culposo o negligente; (3) nexo causal entre el daño y la referida acción culposa o negligente.[20]

Hemos definido el acto negligente como:

...el quebrantamiento del deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel cuidado, cautela, circunspección, diligencia, vigilancia y precaución *que las circunstancias del caso exijan*, para no exponer a riesgos previsibles e irrazonables de daños como consecuencia de la conducta del actor, a aquellas personas que, por no estar ubicadas muy remotas de éste, un hombre prudente y razonable hubiese previsto, dentro de las circunstancias del caso, que quedaban expuestas al riesgo irrazonable creado por el actor.[21]

De lo anterior se desprende que el deber de cuidado exigible consiste en la obligación de todo ser humano de anticipar el peligro de ocasionar daños cuya probabilidad es razonablemente previsible.[22] La determinación de si hubo negligencia se basa en la consideración objetiva de lo que hubiese podido anticipar o prever

---

[19] 31 L.P.R.A. sec. 5141.

[20] Monllor v. Soc. de Gananciales, 138 D.P.R. 600 (1995).

[21] Pacheco Pietri y otros v. E.L.A. y otros, 133 D.P.R. 907, 939 (1993); H.M. Brau del Toro, Los daños y perjuicios extra-contractuales en Puerto Rico, 2da. Ed., San Juan, Pubs. J.T.S, 1986, Vol.1, pág. 183.

[22] H.M. Brau del Toro, op. cit., pág. 184.

bajo idénticas circunstancias un hombre prudente y razonable.[23] Este deber de anticipar y evitar la ocurrencia de un daño, cuya probabilidad es razonablemente previsible, no se extiende a todo riesgo posible.[24] Lo esencial es que se pueda prever en forma general las consecuencias de determinada acción o inacción.[25]

A su vez, para que proceda una acción en daños, deberá existir una relación causal suficiente en derecho entre el acto negligente y los daños producidos, no siendo causa toda condición sin la cual no se hubiera producido el resultado, sino aquella que ordinariamente lo produce, según la experiencia general.[26]

En cuanto a la responsabilidad de los médicos en el desempeño de sus funciones profesionales, hemos intimado que éstos vienen en la obligación de brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica.[27] El demandante deberá establecer mediante prueba pericial cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de sus pacientes. Esa prueba deberá demostrar cuáles son las exigencias de toda la profesión médica, a la luz de los conocimientos científicos disponibles mediante los medios de comunicación y programas de educación continuada.[28] Una vez demostrado cuáles son las normas mínimas de conocimiento y cuidado

---

[23] Íd.

[24] Montalvo v. Cruz, 144 D.P.R. 748, 756 (1998).

[25] Íd.

[26] Sepúlveda de Arrieta v. Barreto, 137 D.P.R. 735, 759 (1994).

[27] Pérez Torres v. Blaudell Ramos, 120 D.P.R. 295, 302 (1988); Ríos Ruiz v. Mark, 119 D.P.R. 816, 820 (1987); Oliveros v. Abréu, 101 D.P.R. 209, 226 (1973).

[28] Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 650-651 (1988).

médico aplicables a la controversia en cuestión, el demandante deberá probar que el demandado incumplió con dichas normas en el tratamiento del paciente y que ello fue la causa de la lesión sufrida.[29] Así, nuestro ordenamiento jurídico obliga al médico a responder por los daños y perjuicios causados **tan sólo** cuando actúa negligentemente, con descuido o falta de la pericia profesional que exigen las circunstancias.[30]

Al momento de evaluar la actuación de un médico debemos recordar, además, que éste posee amplia discreción para formular juicio profesional en cuanto al diagnóstico y tratamiento médico.[31] De conformidad, el médico no incurre en responsabilidad civil si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica.[32] Es decir, no incurre en responsabilidad profesional, el médico que, ante las circunstancias particulares del caso ante sí, utiliza su buen juicio profesional a la luz de los criterios de razonabilidad y aceptación del sector médico.[33] El error de juicio honesto e informado cometido por un médico en el tratamiento de su paciente tampoco constituye fuente de responsabilidad.[34]

Por otra parte, al evaluar una acción en daños por alegada impericia médica debemos tener presente que a los médicos les cobija una presunción a los efectos de que éste ha ejercido un

---

[29] Soc. de Ganaciales v. Géigel, 145 D.P.R. 663, 673 (1998); Medina Santiago v. Vélez, 120 D.P.R. 380, 385 (1988).

[30] Ríos Ruiz v. Mark, supra; H.M. Brau del Toro, op. cit., págs. 248-294.

[31] Ramos, Escobales v. García, González, 134 D.P.R. 969, 975 (1993).

[32] Pérez Torres v. Blaudell Ramos, supra.

[33] Íd.

[34] Íd.

grado razonable de cuidado y el tratamiento fue el adecuado.[35] Por lo tanto, el demandante debe derrotar dicha presunción mediante preponderancia de prueba, demostrando que el médico fue negligente y que dicha conducta negligente fue el factor que con mayor probabilidad causó los daños alegados. La negligencia del médico no se presume por el hecho de que el paciente haya sufrido un daño o que el tratamiento no haya tenido éxito.[36] De igual forma, la parte demandante no podrá descansar, para rebatir la presunción de corrección a favor del médico, en una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. La relación de causalidad no se puede establecer a base de una mera especulación o conjetura.[37]

En cuanto a la responsabilidad civil hospitalaria, nuestro derecho vigente exige que los hospitales ejerzan el cuidado y las medidas previsoras que un hombre prudente y razonable desplegaría ante determinadas circunstancias.[38] Al amparo del artículo 1803 del Código Civil,[39] los hospitales también pueden ser responsables por la falta de pericia atribuible a sus empleados. Dicho estatuto recoge el principio de responsabilidad vicaria por virtud del cual una institución hospitalaria podría ser responsabilizada extracontractualmente por los actos negligentes cometidos por alguno de sus empleados.

Por último, debemos reafirmar la norma que dispone que al evaluar las determinaciones de hechos que un tribunal inferior hiciere sobre impericia médica, fundamentadas en la prueba pericial y documental ofrecida, este Tribunal está en igual posición de

---

[35] Ramos, Escobales v. García, González, supra, págs. 975-976.

[36] Rodríguez Crespo v. Hernández, supra.

[37] Ramos, Escobales v. García, González, supra, pág. 976.

[38] Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 404-405 (1985).

[39] 31 L.P.R.A 5142.

evaluarlas y hacer sus propias conclusiones.[40] No obstante, si las determinaciones están basadas en prueba testifical no pericial vertida en juicio se impone la doctrina de deferencia. La anterior doctrina exige que un tribunal apelativo no intervenga con las determinaciones de hechos ni con la adjudicación de credibilidad que hizo el juzgador de los hechos a nivel de primera instancia, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba.[41] El foro primario es quien está en mejor posición de aquilatar la prueba testifical, toda vez que tuvo la oportunidad de escuchar y ver declarar a los testigos. Reiteramos una vez más que las determinaciones de hechos y la adjudicación de credibilidad del Tribunal de Primera Instancia es merecedora de gran deferencia por parte de los tribunales apelativos del país.

A la luz de lo antes expuesto, pasemos a aplicar la anterior normativa a los hechos particulares de la controversia ante nos.

### III

En el presente caso ambas partes están de acuerdo en que durante la intervención quirúrgica practicada a la señora López Delgado, el doctor Cañizares empleó el cuidado médico exigible en este tipo de procedimiento. No obstante, la negligencia alegada por la parte demandante descansa principalmente en que a la señora López Delgado no se le proveyó un cuidado postoperatorio adecuado. Específicamente, se alegó que la enfermera Ana M. García Balasquide debió avisarle personalmente al doctor Cañizares o al doctor Sanz que, mientras la señora López Delgado estuvo bajo su cuidado en sala de recuperación, tuvo que reforzar su vendaje por sangrado, y no limitarse a anotar tal incidente en el récord. La parte demandante alegó, además, que se debió de mantener a la señora

---

[40] Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 450 (1985).

[41] Belk v. Martínez, 146 D.P.R. 215, 232 (1998).

López Delgado en sala de recuperación durante un periodo de tiempo más prolongado, tomándole la presión arterial con mayor frecuencia, para así detectar si ésta iba en descenso, en cuyo caso era necesario hacerle un examen de hemoglobina. Aducen que dicho examen hubiera detectado la hemorragia interna y, en consecuencia, se hubiese evitado el trauma cerebrovascular. Su posición descansa en que la demandante tuvo una hemorragia interna, lenta y profusa, con pérdida de siete (7) unidades de sangre, lo que causó una anemia severa que disminuyó significativamente la capacidad de la sangre para suministrar oxígeno al tejido cerebral, lo que se alegó produjo el infarto isquémico parietal derecho de su cerebro.

De la evidencia vertida en juicio se desprende que la señora López Delgado fue llevada a la sala de recuperación luego de terminada la intervención quirúrgica. Estando allí, la enfermera Ana M. García Balasquide notó que el vendaje del seno derecho tenía sangre, por lo que procedió a reforzar el mismo, y así lo anotó en el récord. Específicamente, anotó que el vendaje estaba "bloody" y que éste fue reforzado.[42]

El doctor Soltero Harrington, perito de la parte demandante, sostuvo que la enfermera debió notificarle al doctor Cañizares o al doctor Sanz que reforzó el vendaje por causa de un sangrado. No obstante, éste aceptó que si el sangrado hubiera sido uno usual, la enfermera no tenía porqué avisarle al médico y hubiera bastado con reforzarle el vendaje y anotarlo en el récord. Específicamente, de la transcripción del récord surge lo siguiente:

Hon Juez:

...O sea, si el sangrado fuera aún usual, es lo que él le está preguntando, usted entiende que la mejor práctica de la medicina era, de hecho avisar, aunque fuera un sangrado usual?

Dr. Soltero:

---

[42] Caso Núm. CC-01-897, Apéndice del recurso de *certiorari*, págs. 161 y 666.

Que yo interpreto que no era usual y que había que notificar...

Hon Juez:

Sí, pero la pregunta parte de la premisa que fuera usual?

Dr. Soltero:

**Sí. Si es usual no tendría que notificarlo.**[43]

El Tribunal de Primera Instancia le dio crédito al testimonio del doctor Cañizares y de la enfermera García Balasquide a los efectos de que, en este tipo de cirugía, el sangrado presentado por la señora López Delgado era uno usual. La referida enfermera atestiguó que aproximadamente dos (2) veces al día se encuentra con casos similares en donde le toca reforzar el vendaje de un paciente por sangrado y anotarlo en el récord.[44] Catalogó el sangrado de la demandante como uno leve. Explicó que un sangrado leve es normal y esperado en este tipo de intervención quirúrgica. Testificó que no le informó personalmente a los médicos sobre tal hecho, toda vez que reforzar un vendaje por un sangrado leve es un procedimiento rutinario y lo que corresponde en esos casos es anotarlo en el récord. Además, los referidos médicos tuvieron conocimiento de tal hecho al haberse plasmado en el récord. Por su parte, el perito de la parte demandante, doctor Soltero Harrington, interpretó que el sangrado era significativo pero no sostuvo en qué basó su interpretación. Del récord no surge que éste haya sido descrito como significativo por ninguno de los allí presentes. Por el contrario, dicho facultativo admitió que el hecho de que se refuerce un vendaje no necesariamente implica la existencia de una hemorragia significativa. Aceptó, además, que él no practica cirugías de reducción bilateral de senos por lo que no puede opinar sobre lo que constituye un sangrado postoperatorio normal para este

---

[43] Transcripción de la vista en su fondo, Caso Núm. CC-01-897, Apéndice del recurso de *certiorari*, pág. 505.

[44] Íd, pág. 682.

tipo de intervención quirúrgica. Concluimos, por tanto, que la contención del doctor Soltero Harrington, a los efectos de que el sangrado fue significativo y que, por consiguiente, la enfermera debió avisarle personalmente a los médicos sobre el mismo, no quedó sustentada por la prueba.

Por otra parte, los demandantes aducen que se le debió de hacer, a la señora López Delgado, un examen de sangre para determinar los niveles de hemoglobina. Ambas partes están de acuerdo en que las referidas pruebas no son rutinarias sino que depende de la apreciación del médico para determinar qué exámenes posteriores a la intervención quirúrgica, si alguno, se le van a practicar a la paciente. Es decir, quedó establecido que dentro de la mejor práctica de la medicina, la determinación de las pruebas de laboratorio postoperatorias que se deben hacer a una paciente, si alguna, se hacen tomando en consideración su cuadro clínico.

De la prueba vertida en juicio se desprende que la señora López Delgado, al ser evaluada en la sala de recuperación, demostró que podía mover todas sus extremidades, podía respirar profundamente sin ninguna dificultad, no tenía problemas circulatorios, su presión arterial estaba estable, estaba consciente, y sus signos vitales estaban bien. Como consecuencia, obtuvo un ALDRETE de diez (10), siendo diez (10) la puntuación máxima. Específicamente, ésta fue evaluada en la escala de ALDRETE en cuatro (4) ocasiones, obteniendo una puntuación máxima de diez (10) en cada una de ellas.[45]

---

[45] La señora López Delgado fue evaluada en la escala de ALDRETE a las diez y diez de la mañana (10:10 a.m.), a las diez y cincuenta de la mañana (10:50 a.m.), a las once y treinta de la mañana (11:30 a.m.), y a las doce y diez de la tarde (12:10 p.m.). ALDRETE es la escala que se utiliza para monitorizar los signos vitales del paciente como lo son su respiración, su capacidad de movimiento, estado de conciencia, circulación, entre otros. Véase: "Post Anesthesia Care Unit Record", Caso Núm. CC-01-897, Apéndice del recurso de certiorari, pág. 161; Transcripción de la vista en su fondo, supra, págs. 659-660, 770 y 772.

En sala de recuperación, la señora López Delgado pudo orinar y toleró la ingesta de fluido (café). Ello fue indicativo de que estaba adecuadamente hidratada. El perito de la parte demandada, doctor Porro Vizcarra, indicó que la producción de orina es lo primero que se afecta cuando hay un sangrado agudo por lo que el hecho de que la señora López Delgado orinara antes de ser dada de alta evidenció que no sangraba profusamente en ese momento. Así también, el propio perito de la parte demandante, doctor Soltero Harrington, aceptó que el parámetro de la orina es más preciso que el de la presión arterial a los fines de determinar una posible sangría. Luego de que se dejó de monitorizar la presión y el pulso a la señora López Delgado, ésta no demostró ningún signo o síntoma indicativo de hemorragia como lo sería estar sudorosa, tener taquicardia o desmayos. Era capaz de caminar, no tenía mareos y estaba consciente. Es decir, la señora López Delgado no presentó un cuadro indicativo de hemorragia, anemia o alguna complicación. Por el contrario, todo parecía estar dentro de lo normal para este tipo de procedimiento. De esta forma, la señora López Delgado no presentó signos indicativos de que se le tuviera que hacer algún examen en particular, por lo que se prosiguió con el procedimiento rutinario para darle de alta a una paciente de cirugía ambulatoria y a las doce y diez de la tarde (12:10 p.m.) se le dio de alta.

En la mañana siguiente al día de la intervención quirúrgica, la enfermera señora M. Maldonado llamó por teléfono a la señora López Delgado. Del récord surge que su esposo atendió la llamada y le informó a la enfermera que su esposa se encontraba bien aunque levemente adolorida.[46]

En la visita postoperatoria, el 4 de marzo de 1992, el doctor Cañizares evaluó a la señora López Delgado y le removió los vendajes, los cuales estaban secos, como debía esperarse en ese

---

[46] Récord de Las Américas Ambulatory Surgical Center, Caso Núm. CC-01-895, Apéndice del recurso de certiorari, pág 168.

tipo de intervención quirúrgica. También, le colocó a la paciente un ajustador especial. La señora López Delgado le manifestó que sentía náuseas ocasionales y "flojera". Ella alegó haberle informado, también, que sentía "el pies izquierdo como al revés." Sin embargo, el doctor Cañizares negó que en ese momento ella le hubiese informado tal cosa. Dicho facultativo anotó en el récord que la señora López Delgado le manifestó tener náuseas ocasionales y episodios de debilidad. Anotó, además, lo siguiente: "She may be weak due to decreasing hemoglobine; will start on iron next week due to constipation, bed rest and continue antibiotics."[47] Se le tomó lectura de su presión arterial la cual reflejó una presión sistólica de ciento treinta y siete (137) y una diastólica de ochenta y cinco (85).[48] Es decir, su presión arterial estaba normal. Más aún, ésta se encontraba más alta que la presión arterial que estuvo presentando el día de la intervención quirúrgica. No estaba sudorosa, mareada o con taquicardia. El doctor Cañizares declaró que no ordenó un "CBC" o prueba alguna de hemoglobina a la señora López Delgado porque ella no presentó signos o síntomas de que tuviera una anemia aguda. Aclaró en cuanto a lo anterior, y así fue corroborado por el perito de la parte demandante, que es normal y muy común que todo paciente que es operado y sangra le baje la hemoglobina y se sienta débil, y no por eso se les envía a hacerse un laboratorio de hemoglobina.

De todo lo anterior se desprende que la señora López Delgado no presentó un cuadro clínico indicativo de que se le tuviera que realizar un examen de hemoglobina. Ante tales circunstancias, no podemos colegir que los demandados se apartaron de la buena práctica médica al momento de formular su juicio profesional de no practicarle un examen de hemoglobina a la demandante.

---

[47] Íd., pág. 140; Transcripción de la vista en su fondo, supra, pág. 524.

[48] Caso Núm. CC-01-895, Apéndice del recurso de certiorari, pág. 140.

Por otra parte, el perito de la parte demandada, doctor Soltero Harrington, indicó que se le debió haber tomado la presión arterial a la señora López Delgado cada quince (15) minutos y, en particular, justo antes de haber sido dada de alta. No obstante, los peritos de la parte demandada sostuvieron que lo anterior no es requerido de conformidad con la mejor práctica de la medicina. Por su parte, la señora López Delgado siempre presentó una presión arterial normal, tanto en su estadía en la sala de recuperación como en sus visitas postoperatorias. Durante su estadía en sala de recuperación se le tomó la lectura de su presión arterial en seis (6) ocasiones. En todas ellas, los resultados se encontraban dentro de los parámetros normales.[49] Asimismo, en su primera visita postoperatoria, el 4 de marzo de 1992, se le tomó la lectura de su presión arterial la cual reflejó una presión sistólica de ciento treinta y siete (137) y una diastólica de ochenta y cinco (85), es decir, un poco más alta que la presión arterial que estuvo presentando el día de la intervención quirúrgica. Aún en su tercer día postoperatorio, cuando fue admitida al Hospital Hermanos Meléndez con un trauma cerebrovascular, se le tomó una lectura de su presión arterial que reflejó una presión sistólica de ciento veinte (120) y una diastólica de sesenta (60), o sea, reflejó una presión arterial normal.[50] Desde entonces hasta que fue dada de alta en dicha institución, la señora López Delgado no reveló hipotensión (presión baja). Es decir, no existe documentación que revele que la demandante estuvo hipotensa en momento alguno, por el contrario la prueba demuestra que siempre estuvo normotensa (presión normal). **El sangramiento postoperatorio de la señora López Delgado, de carácter insidioso, lento y oculto, fue enmascarado por el hecho de que ella nunca demostró hipotensión.**

---

[49] Transcripción de la vista en su fondo, <u>supra</u>, pág. 479-480.

[50] Caso Núm. CC-01-895, Apéndice del recurso de *certiorari*, pág. 180.

**La lentitud de dicho sangramiento permitió que mecanismos hemodinámicos compensatorios pudiesen actuar con suficiente tiempo y magnitud para amortiguar el efecto del sangramiento subagudo padecido por la paciente, permitiendo que la presión sanguínea se mantuviese dentro de los límites normales.**[51] La presión arterial de la señora López Delgado siempre se mantuvo normotensa (normal) por lo que la toma de presiones arteriales adicionales no hubiese demostrado una baja médicamente significativa que hubiese ayudado a prevenir de alguna forma el trauma cerebrovascular. De igual forma, **el carácter lento, insidioso y oculto de la hemorragia sufrida por la señora López Delgado logró enmascarar la misma, evitando que se manifestaran síntomas demostrativos de dicha situación.** Fue este hecho infortunado lo que impidió que la hemorragia padecida por la señora López Delgado se manifestara de una forma detectable. Por lo que aun partiendo de la premisa de que, si el sangramiento sufrido por la señora López Delgado hubiera sido descubierto con anterioridad, el trauma cerebrovascular no hubiese ocurrido, no quedó evidenciado con la prueba que el no detectarlo se debió a algún acto negligente de los demandados.

Lo sufrido por la señora López Delgado y su familia como consecuencia de este infortunado accidente cerebrovascular es muy triste y lamentable. Las acciones por alegada impericia médica constituyen o representan un reto especial para los jueces. Dichos casos siempre versan sobre la ocurrencia de un daño; uno que, por lo general, resulta impresionante y doloroso. No obstante, el natural sentimiento de compasión que todo ser humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, los jueces tenemos que mantener siempre presente que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable del mismo. En otras palabras, no podemos darnos el

---

[51] Caso Núm. CC-01-893, Apéndice del recurso de *certiorari*, pág. 239.

lujo de que nuestros sentimientos dominen nuestro discernimiento. De así permitirlo, estaríamos incumpliendo con nuestra función como jueces.[52]

A la luz de lo antes dicho y luego de un análisis minucioso de la transcripción de la evidencia, de los récords médicos y de los autos, debemos colegir que no se probó que los demandados se apartaran de las normas de excelencia profesional reconocidas por la profesión médica. Al cumplir con nuestra función revisora no podemos, en ausencia de prueba, reconocer a este nivel apelativo los elementos requeridos por el artículo 1802 del Código Civil, supra.[53] Según indicáramos, la parte demandante debió demostrar mediante preponderancia de prueba, que la parte demandada incumplió con las normas mínimas de conocimiento y cuidado médico aplicables en la situación particular de autos, y que dicho incumplimiento fue la causa de los daños sufridos por los demandantes. Un examen detenido de la prueba nos mueve a concluir que el Tribunal de Primera Instancia no erró al determinar que los demandados no se apartaron de las normas de excelencia profesional reconocidas por la profesión médica. Las determinaciones de hechos formuladas por el Tribunal de Primera Instancia están sostenidas por la prueba a la cual dicho foro le impartió credibilidad.

IV

Por los fundamentos antes expuestos, se revoca la sentencia emitida por el Tribunal de Apelaciones y reinstalamos la sentencia dictada por el Tribunal de Primera Instancia.

EFRAIN E. RIVERA PEREZ
Juez Asociado

---

[52] Pérez Torres v. Blaudell Ramos, 120 D.P.R. 295, 297-298 (1988).

[53] Ríos Ruiz v. Mark, supra, pág. 821-822.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda López Delgado y otros

      Recurridos

           v.

|  |  |
|---|---|
| CC-2001-893 | Certiorari |
| CC-2001-895 | |
| CC-2001-897 | |

Dr. Orlando Cañizares y otros

      Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 5 de octubre de 2004.

Por los fundamentos antes expuestos en la Opinión que antecede, se revoca la sentencia emitida por el Tribunal de Apelaciones y reinstalamos la sentencia dictada por el Tribunal de Primera Instancia.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton concurre sin opinión escrita. El Juez Asociado señor Fuster Berlingeri no intervino. La Jueza Asociada señora Fiol Matta inhibida.

                    Patricia Otón Olivieri
                    Secretaria del Tribunal Supremo