Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| CÁNDIDO ORTIZ CÁEZ Y OTROS<br><br>Apelantes<br><br>v.<br><br>HOSPITAL MENONITA DE CAGUAS, INC., Y OTROS<br><br>Apelados | KLAN202500167 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.: CG2020CV02755<br><br>Sobre: Daños y Perjuicios Impericia Médica |

Panel integrado por su presidenta, el Juez Rivera Marchand[1], la Jueza Martínez Cordero y el Juez Cruz Hiraldo.

*Martínez Cordero, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de junio de 2025.

Comparece Cándido Ortiz Cáez (en adelante señor Ortiz Cáez); Richy Nelson Ortiz Rivera, Santos Javier Ortiz Rivera y Edgar Ortiz Rivera (en adelante, Hermanos Ortiz Rivera) (en conjunto, parte apelante) mediante un recurso de *Apelación*, para solicitarnos la revisión de la *Sentencia* emitida y notificada el 31 de enero de 2025, por el Tribunal de Primera Instancia, Sala Superior de Caguas.[2] Mediante la *Sentencia* apelada, el foro primario declaró *No Ha Lugar* la *Demanda* instada contra el Hospital Menonita Caguas, Inc. (en adelante, Hospital Menonita y/o parte apelada) y ordenó el archivo y sobreseimiento de la acción instada.

Por los fundamentos que expondremos, se *confirma* la *Sentencia* apelada.

---

[1] Mediante la Orden Administrativa TA-2025-070 del 9 de mayo de 2025, se designó al Hon. Monsita Rivera Marchand para entender y votar en el caso de epígrafe en sustitución del Hon. Abelardo Bermúdez Torres.
[2] Apéndice I del recurso, a las págs. 1-28.

I

La acción de autos inició, el 30 de diciembre de 2020, cuando la parte apelante presentó una *Demanda* contra la parte apelada, las Corporaciones ABC; Anestesia del Caribe, CSP (Anestesia del Caribe), y Compañías Aseguradoras ABC, sobre daños y perjuicios e impericia médica.[3] En el escrito, se expresó que la referida impericia fue, presuntamente, cometida en la atención médica de la fallecida, Rosa D. Rivera Cruz (en adelante, señora Rivera Cruz y/o paciente), quien, conforme surge del expediente ante nos, era esposa del señor Ortiz Cáez y madre de los Hermanos Ortiz Rivera. A esos efectos, en el pliego se relató que, a raíz de un accidente automovilístico, la señora Rivera Cruz desarrolló molestias y dolores en el cuello a consecuencia de nervios pillados en el área cervical. Según surge de las alegaciones de la *Demanda,* en virtud del mencionado padecimiento, la señora Rivera Cruz acudió a su neurólogo, quien, luego de realizarle una serie de estudios, le indicó que debía operarse, puesto que, de no hacerlo, quedaría parapléjica. La parte apelante detalló que, por recomendación del aludido neurólogo, la señora Rivera Cruz acudió ante el doctor Jorge E. Soto del Cueto (en adelante, doctor Soto del Cueto) para ser operada. Conforme se desprende del pliego, practicada la operación, la señora Rivera Cruz recibió terapia física por aproximadamente un (1) mes. No obstante, lo anterior, la señora Rivera Cruz se le dificultaba caminar y tragar, tampoco podía hablar bien. Igualmente, se acentuó que la señora Rivera Cruz no podía levantar el brazo derecho. Según alegó la parte apelante, por las señaladas complicaciones, la señora Rivera Cruz optó por acudir nuevamente ante el doctor Soto del Cueto. Este, presuntamente, encontró que los tornillos de la placa que se había colocado en el área cervical se

---

[3] Apéndice II del recurso, a las págs. 29-40.

habían salido de sitio y le estaba tocando la tráquea. En consecuencia, y según adujo la parte apelante, el referido médico mandó a operar a la señora Rivera Cruz nuevamente, ya que, de lo contrario, esta podía morir asfixiada.

En el escrito, la parte apelante indicó que la segunda operación realizada a la señora Rivera Cruz por el doctor Soto del Cueto fue practicada el 19 de febrero de 2020. Ahora bien, ese día, la señora Rivera Cruz, alegadamente, fue intervenida mediante dos (2) operaciones separadas. La *primera* para remediar la situación de la placa salida de sitio en el área cervical, y la *segunda* para remover un hematoma postoperatorio. Conforme manifestó la parte apelante en la *Demanda*, luego de la *segunda* operación, la señora Rivera Cruz permaneció entubada y sedada y fue transferida primero a un cuarto de recuperación y, posteriormente, a la Unidad de Cuidado Intensivo. Según se adujo, allí, la señora Rivera Cruz sufrió una serie de complicaciones lo cual culminó en falló cardiaco, y, consecutivamente, muerte cerebral. Indicó la parte apelante, que el 25 de febrero de 2020, el señor Ortiz Cáez autorizó a que desconectaran a la señora Rivera Cruz, y firmó la autorización necesaria para que donaran los órganos de la finada.

Por lo antes expuesto, la parte apelante esbozó en la referida demanda, entre otras cosas, que la parte apelada cometió impericia médica y hospitalaria, debido a que la evaluación, diagnóstico, monitoreo y tratamiento médico brindado a la señora Rivera Cruz se desvió de los estándares médicos generalmente aceptados en el cuidado médico. Asimismo, enfatizó que la parte apelada fue negligente debido a que no cumplió con los estándares y requerimientos de la buena práctica de la medicina.

De otra parte, añadió que el personal médico y de enfermería del Hospital Menonita directamente ocasionó y/o contribuyó a los daños de la parte apelante, por lo cual, debía responder

vicariamente bajo los artículos 1802 y 1803 del Código Civil 1930,[4] hoy derogado. Por su parte, adujo que, a consecuencia de la negligencia de las partes demandadas, tanto el señor Ortiz Cáez, como los Hermanos Ortiz Cruz, habían sufrido angustias mentales a consecuencia de las circunstancias en las que falleció la señora Rivera Cruz. En virtud de lo expuesto, la parte apelante solicitó que se declarara con lugar la *Demanda* y se ordenara el pago total de dos millones ($2,000,000.00) por todos los daños, perjuicios y angustias mentales causadas a la parte apelante.

En reacción, el 19 de marzo de 2021, el Hospital Menonita instó su *Contestación a Demanda*.[5] En resumen, negó la mayoría de los hechos alegados en la *Demanda* y presentó varias defensas afirmativas. Entre estas, la ausencia de hechos constitutivos de una reclamación que justificara la concesión de un remedio y que la acción instada estaba total o parcialmente prescrita. Por otro lado, adujo que no violó ningún deber para con la paciente. Asimismo, esgrimió que el doctor Soto del Cueto era un cirujano ortopeda con licencia para ejercer su profesión en Puerto Rico y ostentaba privilegios para utilizar las facilidades del Hospital Menonita para realizar procedimientos quirúrgicos, incluso a sus pacientes privados. De igual forma, puntualizó que la señora Rivera Cruz era una paciente privada del doctor Soto del Cueto debido a que acudió de primera instancia a este y le confió el cuidado de su condición de salud. Por lo anterior, arguyó que la parte apelada entró de forma incidental a la relación establecida entre la paciente y el doctor. A tenor, adujo que no respondían por los alegados actos de impericia

---

[4] 31 LPRA secs. 5141 y 5142 (derogados). El Código Civil de Puerto Rico de 1930 fue derogado por el Código Civil de Puerto Rico de 2020, aprobado mediante la Ley Núm. 55 de 1 de junio de 2020, 31 LPRA sec. 5311 *et seq*. Para fines de este caso, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia que nos ocupa.
[5] Apéndice III del recurso, a las págs. 41-58.

médica cometidos por el doctor Soto del Cueto, y que no existía responsabilidad del Hospital Menonita a favor de la parte apelante.

Luego de varios trámites innecesarios pormenorizar, entre ellos, la presentación de la alegación responsiva de Anestesia del Caribe,[6] el 28 de noviembre de 2023, las partes del título presentaron el *Informe sobre conferencia con antelación a juicio*.[7] Así las cosas, el juicio en su fondo quedó señalado para los días 8, 9 y 10 de abril de 2024.[8]

Conviene destacar que, durante el *primer* día de juicio, la parte apelante informó en corte abierta haber alcanzado un acuerdo transaccional parcial confidencial con Anestesia del Caribe. Siguiendo el mismo curso de acción, durante el *segundo* día de juicio, la parte apelante y Anestesia del Caribe firmaron el acuerdo transaccional en corte abierta. Como parte de las incidencias acaecidas en ese *segundo* día de juicio, el tribunal de instancia corroboró que la transacción alcanzada liberaba de responsabilidad al Hospital Menonita en cuanto a su relación interna con Anestesia del Caribe, como alegados cocausantes del daño.[9] En lo referente al *tercer* día de juicio, el 10 de abril de 2024, la parte apelante presentó una *Moción sobre desistimiento voluntario con perjuicio*,[10] en la cual solicitó que se dictara sentencia parcial en cuanto a Anestesia del Caribe. En respuesta, el foro de instancia dio por desistida con perjuicio la acción contra la antedicha parte, por lo que, en esa misma fecha, el foro *a quo* dictó la correspondiente *Sentencia Parcial*.[11] Atendido el particular antes reseñado, y según hemos expuesto, el juicio tuvo una duración de tres (3) días.

---

[6] Apéndice IV del recurso, a las págs. 59-63.
[7] Apéndice V del recurso, a las págs. 64-96.
[8] Apéndice I del recurso, a la pág. 9.
[9] *Íd.*, a las págs. 8-9.
[10] Apéndice VI del recurso, a las págs. 97-98.
[11] Apéndice VII del recurso, a la pág. 99.

Durante el juicio, la prueba testifical recibida por el foro de instancia en cuanto a la parte apelante consistió en los testimonios del doctor Soto del Cueto; la neumóloga intensivista, la doctora Rosángela Fernández Marrero; el anestesiólogo, el doctor Adalberto López Avilés; como testigos hostiles: (i) el enfermero Luis Haddock Morales (enfermero Haddock Morales), y (ii) la enfermera Daisy Pedraza Montañez (enfermera Pedraza Montañez), ambos empleados del Hospital Menonita; la persona perito la doctora Elizabeth Frost (doctora Frost), y la parte apelante, entiéndase, Awilda Ortiz Rivera, Santos Ortiz Rivera, Edgar Ortiz Rivera, Richy Nelson Ortiz Rivera y Cándido Ortiz Cáez.[12]

En cuanto a la prueba documental de la parte apelante, la misma consistió en dos (2) documentos: (i) el *Curriculum Vitae* de la doctora Elizabeth Frost, marcado como Exhibit 1, y (ii) una foto de la Sra. Rosa D. Rivera y el Sr. Cándido Ortiz Cáez, marcado como Exhibit 2.[13] Por otro lado, la prueba documental estipulada por las partes consistió, también, en dos (2) documentos: (i) el expediente médico de la señora Rosa Rivera en Menonita Caguas, marcado como Exhibit Conjunto 1, y (ii) el Informe Pericial de la doctora Frost, marcado como Exhibit Conjunto 2.[14]

Culminado el turno del desfile de prueba sobre negligencia de la parte apelante, el Hospital Menonita incoó en corte abierta una solicitud de desestimación al amparo de la Regla 39.2(c) de las de Procedimiento Civil,[15] la cual fue declarada *No Ha Lugar* en esos momentos. Así pues, la parte apelante procedió a presentar la prueba sobre daños. Culminada la misma, el Hospital Menonita solicitó nuevamente la desestimación al amparo de la precitada

---

[12] Apéndice I del recurso, a la pág. 9.
[13] *Íd.*, a la pág. 11.
[14] *Íd.* Huelga acentuar que el informe pericial de la doctora Frost fue marcado como exhibit conjunto en virtud del acuerdo transaccional entre la parte apelante y Anestesia del Caribe.
[15] Apéndice I del recurso, a la pág. 10.

regla.[16] Puntualizamos que, según se desprende de los autos, la parte apelada, principalmente fundamentó esta segunda moción de desestimación en que la causa de acción en su contra estaba prescrita. Asimismo, añadió que la parte apelante no había cumplido con comprobar la alegada negligencia por parte del personal de enfermería del hospital.[17]

Por otra parte, se desprende que la parte apelada en corte abierta expresó que los testimonios de sus testigos, el enfermero Luis Haddock Morales y la enfermera Daisy Pedraza Montañez, constituían prueba acumulativa innecesaria, ya que habían declarado previamente como testigos hostiles de la parte apelante.[18] Evaluado lo anterior, el foro primario acogió la solicitud de la parte apelada y, en consecuencia, los testigos anunciados por la referida parte no fueron interrogados durante su turno de prueba. En reacción, la parte apelante solicitó al Tribunal aplicar la presunción de la Regla de Evidencia 304 (5), debido a que la parte apelada no utilizó los testigos anunciados. Alegó que, los referidos testimonios fueron voluntariamente suprimidos, puesto que, conforme a la aludida Regla de Evidencia, debían entenderse adversos a la parte apelada. Seguido, la parte apelada se opuso a la petición y reafirmó su posición referente a prueba acumulativa. De ahí, el Tribunal se reservó su decisión en cuanto a lo solicitado y el caso quedó sometido para la determinación del Tribunal.[19]

Finalmente, y casi diez (10) meses después, el 31 de enero de 2025, el foro de instancia emitió y notificó la *Sentencia* apelada.[20] Mediante el dictamen apelado el tribunal inferior declaró *No Ha Lugar* la *Demanda* instada contra el Hospital Menonita y ordenó el archivo y sobreseimiento de la acción instada.

---

[16] Apéndice I del recurso, a la pág. 10.
[17] *Íd.*
[18] *Íd.,* a las págs. 10-11.
[19] *Íd.,* a la pág. 10.
[20] *Íd.,* a las págs. 1-28.

Como parte de la *Sentencia,* el tribunal *a quo* expresó que en el *Informe de conferencia con antelación a juicio* (ICAJ) las partes estipularon los siguientes hechos:

1. Allá para el 19 de febrero del 2020, el Dr. Adalberto López era un anestesiólogo que proveía servicios de anestesiología en el Hospital Menonita de Caguas a través de Anestesia del Caribe, CSP.

2. Anestesia del Caribe, CSP, tenía para el 19 de febrero del 2020 un contrato con el Hospital Menonita de Caguas para proveer servicios de Anestesiología a pacientes del Hospital.

3. El 19 de febrero de 2020[,] la paciente Rosa Delia Rivera Cruz fue operada en las facilidades del Hospital Menonita de Caguas.

4. El cirujano a cargo de dicha cirugía lo fue el Dr. Jorge Soto del Cueto.

5. El anestesiólogo que participó en dicha cirugía fue el Dr. Adalberto López.

6. Posterior a la cirugía, aproximadamente a las 5 pm del 19 de febrero de 2020, la paciente Rosa Rivera Cruz se auto extubó en la sala de recuperación.

7. El 21 de febrero de 2020 a las 2:44 am, estando la paciente Rosa Rivera Cruz en la Unidad de Cuidado Intensivo, se activó una Clave Verde.

8. Ya para el 25 de febrero de 2020, la paciente Rosa Rivera Cruz había sido diagnosticada con encefalopatía por hipoxia o muerte cerebral.

9. El 26 de febrero de 2020, la paciente Rosa Rivera Cruz falleció luego de que su esposo autorizó a que fuese desconectada de la maquinaria que la mantenía viva ("Life Support"). Véase, Entrada Núm., 38 a la página 12.[21]

De otro lado, escuchada y analizada la prueba recibida y aquilatada su credibilidad y confiabilidad, el foro de instancia emitió las siguientes ciento una (101) determinaciones de hechos:

1. Para el 19 de febrero de 2020[,] la Sra. Rosa Delia Rivera Cruz era paciente privada del Dr. Soto del Cueto, cirujano ortopeda con especialidad en columna vertebral.

2. Para el 19 de febrero de 2020[,] el Dr. Soto del Cueto tenía privilegios en Menonita Caguas.

3. El Dr. Soto del Cueto había operado a la Sra. Rivera en el 2018 de una fusión cervical cuya placa con tornillos se había desplazado y estaba rozando el hueso en el área cervical.

---

[21] Apéndice I del recurso, a las págs. 8-9.

4. En su oficina médica[,] el Dr. Soto del Cueto le explicó a la Sra. Rivera que era sumamente importante que se removiera el implante de la cirugía del 2018 en otra cirugía a efectuarse en Menonita Caguas.

5. La Sra. Rivera consintió a la cirugía y realizó preadmisión el 11 de febrero de 2020 en Menonita Caguas.

6. El internista Dr. Eric M. Pérez Carrasquillo realizó la evaluación preoperatoria de la Sra. Rivera el 11 de febrero de 2020.

7. La evaluación preanestesia también fue realizada el 11 de febrero de 2020.

8. El anestesiólogo Dr. Adalberto López Avilés realizó la evaluación final de anestesia a la Sra. Rivera el 19 de febrero de 2020 a las 7:27 am.

9. Con el consentimiento informado de la Sra. Rivera, el 19 de febrero de 2020 a las 7:50 am se inició la anestesia general.

10. Con el consentimiento informado de la Sra. Rivera, el 19 de febrero de 2020 a las 8:40 am[,] el Dr. Soto del Cueto inició la operación de "Anterior Cervical Discectomy and Fusion C3-C4 with Anterior Titanium Plate and Removal or Previous Implants"[,] la cual terminó a las 10:15 am.

11. El 19 de febrero de 2020 a las 11:08 am[,] la Sra. Rivera presentó hematoma postoperatorio con dificultad respiratoria al revertirse la anestesia general y el Dr. López Avilés reentubó a la Sra. Rivera.

12. El 19 de febrero de 2020 a las 11:30 am[,] el Dr. Soto del Cueto reevaluó a la Sra. Rivera y decidió volver a intervenir quirúrgicamente.

13. El 19 de febrero de 2020 a las 11:40 am[,] el Dr. Soto del Cueto inició una intervención de "Cervical Spine Hematoma Evacuation" la cual terminó a las 12:20 pm.

14. Para las intervenciones quirúrgicas del 19 de febrero de 2020 la anestesia terminó de administrarse a las 12:55 pm.

15. El 19 de febrero de 2020 a las 12:58 pm[,] se trasladó a la Sra. Rivera a "Recovery Room" donde fue recibida a la 1:07pm conectada a ventilador mecánico.

16. El 19 de febrero de 2020 a las 5:20 pm[,] la paciente se quitó el tubo del ventilador mecánico de lo que se notificó inmediatamente al Dr. López Avilés quien fue a asistir a la paciente junto a anestesista.

17. El Dr. López Avilés ordenó colocar "venturi mask" al 35%, lo que se hizo y la Sra. Rivera tuvo saturación de 100% y se observó alerta y orientada.

18. Luego de haber drenado el hematoma postoperatorio la próxima intervención del Dr. Soto del Cueto con la Sra. Rivera fue después que ella se haló el tubo y se lo sacó. El Dr. Soto del Cueto no recuerda quién se lo dijo, pero fue alguien de los que trabaja en Sala de Operaciones.

19. El Dr. Soto del Cueto no estaba en el "Recovery Room" cuando la Sra. Rivera haló el tubo y se lo sacó.

20. El 19 de febrero de 2020 a las 5:55 pm[,] el Dr. Soto del Cueto evaluó a la Sra. Rivera mientras estaba en "Recovery Room".

21. El Dr. Soto del Cueto declaró que entiende que una vez la Sra. Rivera estaba en "Recovery" el equipo de anestesia era el que tenía que seguir con los procedimientos y determinar el curso de acción a seguir.

22. Según el Dr. Soto del Cueto, el Dr. López Avilés le recomendó que no se volviera a entubar a la Sra. Rivera.

23. Según el Dr. Soto del Cueto, él aceptó la recomendación del Dr. López Avilés.

24. Según el Dr. Soto del Cueto, su decisión inicial había sido que la Sra. Rivera se mantuviera entubada, pero le dio deferencia a Anestesia y se dejó llevar por lo que le dijo el anestesiólogo Dr. López Avilés.

25. Para el 19 de febrero de 2020, el Dr. López Avilés tenía un contrato de servicios profesionales con Anestesia del Caribe, CSP que a su vez tenía un contrato de exclusividad con Menonita Caguas.

26. Por virtud de su contrato con Anestesia del Caribe, CSP, el Dr. López Avilés tenía privilegios en Menonita Caguas para el 19 de febrero de 2020 y atendió a la Sra. Rivera.

27. El Dr. López Avilés no fue el anestesiólogo que contestó la consulta preanestesia el 11 de febrero de 2020.

28. El Dr. López Avilés reconoció que la Sra. Rivera, al tener Parkinson y reflujo gástrico presentaba un riesgo mayor de aspiración.

29. El Dr. López Avilés le dio Zofrán a la paciente como un antiácido que reduce el PH del estómago.

30. Para el Dr. López Avilés el Zantac es otro antiácido.

31. Según el Dr. López Avilés, tanto el Zofrán como el Zantac se pueden usar para evitar el síndrome de aspiración cuando hay reflujo gástrico.

32. El Dr. López Avilés declaró que la Sra. Rivera se extubó estando en Sala de Recuperación y que él se percató de que la paciente estaba agitada por lo que decidió aguantar y observar a ver cómo ella respondía y no volverá a someterla a entubación.

33. En ese momento, el Dr. López Avilés no ordenó pruebas de gases arteriales ("ABC").

34. En ese momento, el Dr. López Avilés no ordenó placa de pecho.

35. En ese momento, el Dr. López Avilés no documentó haber auscultado a la Sra. Rivera, pero él entiende que tuvo que haberla auscultado.

36. Para el Dr. López Avilés, la Sra. Rivera no aspiró.

37. Según el Dr. López Avilés, cuando el vio que la oximetría de la Sra. Rivera estaba normal, entendió que se podía ir y transfirió de alta a la Sra. Rivera de "Recovery" a Intensivo.

38. El Dr. López Avilés no consultó con la neumóloga Dra. Rosángela Fernández Medero la decisión de dejar a la Sra. Rivera sin el tubo.

39. El 19 de febrero de 2020 a las 10:10 pm[,] la Sra. Rivera fue trasladada de "Recovery Room" a Intensivo y en ese momento la Sra. Rivera estaba ventilando espontáneamente.

40. Para el 19 de febrero de 2020, y desde octubre de 2009, la Dra. Fernández Medero tenía privilegios en Menonita Caguas.

41. La Dra. Fernández Medero fue consultada y atendió a la Sra. Rivera el 19 de febrero de 2020 a las 10:24 pm[,] cuando la paciente estaba en Intensivo.

42. La consulta a la Dra. Fernández Medero fue como subespecialista en Pulmonología.

43. La Dra. Fernández Medero no estuvo de acuerdo con que la Sra. Rivera no fuera re-entubada después que se extubó en "Recovery".

44. La Dra. Fernández Medero sospechó que la Sra. Rivera tenía síndrome de aspiración, exceso de secreciones, Mendelson's Syndrome o aspiración química de contenido gástrico en la vía aérea.

45. Para la Dra. Fernández Medero, la neumonitis química produce inflamación.

46. Según la Dra. Fernández Medero, puede ser algo inocuo como puede complicar al paciente.

47. El 19 de febrero de 2020, la Dra. Fernández Medero no confirmó su sospecha de síndrome de aspiración.

48. El 20 de febrero de 2020 a las 7:00 pm[,] la enfermera Ivonne Llinás Rosario, BSN 82331, documenta que la Sra. Rivera tiene un patrón respiratorio normal en un "venturi mask" al 40%.

49. Los signos vitales de la Sra. Rivera[,] el 20 de febrero de 2020 a las 10:00 pm[,] fueron documentados por la Sra. Llinás Rosario.

50. El 20 de febrero de 2020 a las 10:00 pm[,] la enfermera Sra. Llinás Rosario llamó al Dr. Eric M. Pérez Carrasquillo para notificarle que la Sra. Rivera tenía la presión en 83/43 mmHg.

51. El Dr. Pérez Carrasquillo no emitió órdenes médicas a ese momento por lo que la Sra. Rivera se mantuvo en observación de conformidad con la "Nota de Hipotensión" del 20 de febrero de 2020 a las 10:00 pm de la enfermera Sra. Llinás Rosario.

52. El 21 de febrero de 2020 a las 2:44 am se activó Clave Verde "Rapid Response y Cardiac".

53. Al activarse la Clave Verde a las 2:44 am[,] la Sra. Rivera se encontraba hipoactiva con presiones 36/22, pulso 43 y saturando 70%.

54. Conforme al expediente clínico estipulado por las partes, los integrantes del "Rapid Response Team" que participaron en la Clave Verde fueron la Sra. Llinás Rosario, quien dirigió la Clave Verde, la terapista respiratoria Rolmarie Colón García, y el personal de enfermería N. Hernández, Luis Haddock, Daisy Pedraza y S. Díaz.

55. El Sr. Luis A. Haddock Morales es enfermero en Menonita Caguas desde hace como 12 años.

56. Para febrero de 2020, el Sr. Haddock Morales trabajaba en la Unidad de Cuidado Intensivo de Menonita Caguas.

57. Como parte de su trabajo, el Sr. Haddock Morales se mantiene al día con el Protocolo de "Advanced Cardiovascular Life Support" ("ACLS") que es para cuando una persona se arresta.

58. El Sr. Haddock Morales no entuba.

59. El Sr. Haddock Morales administra atropina y epinefrina.

60. El médico es quien entuba al paciente.

61. Según declaró el Sr. Haddock Morales, la Sra. Llinás Rosario no trabaja para Menonita Caguas.

62. La activación de Clave Verde "Rapid Response Team" el 21 de febrero de 2020 a las 2:44 am duró hasta las 2:54 am cuando se convirtió en una Clave Verde "Cardiac" o de arresto cardiorrepiratorio.

63. La "Nota de Clave Verde Rapid Response y Cardiac" del 21 de febrero de 2020 a las 2:44 am de la Sra. Llinás Rosario no dice quién hizo la entubación. La "Nota de Clave Verde Rapid Response y Cardiac" de la enfermera Sra. Llinás Rosario documenta lo siguiente: "Se activa Clave la paciente se encontraba hipoactiva con presiones en 36/22, pulso 43 y saturando 70%. Se le administraron 0244: atropina, 0247: atropina, 0250 bicarbonato, a las 2:54 am se convirtió en Clave Verde Cardiac, 0254: 1 epinefrina, 0257: 2 epinefrina, 0300: epinefrina; 0304 atropina, dextro: 206, se entuba a la paciente a las 3:08 con un tubo 7.5 y fijado en 23 cm. Se le realiza placa de pecho y línea central en femoral derecha luego de tres intentos en subclavia derecha. La paciente fue entubada en el primer intento. La clave fue asistida por el Dr. López. Dr. López monta a la paciente en Levophed 8 mg / 250 ml DW 5% a 5 mcg/min, vasopresina 40 unit/100 ml a 6 ml/hr y full drip de ringer lactate y luego a 100 ml/hr ringer lactate. Se ejecutan todas las órdenes."

64. Según la hoja de "Clave Verde Cardiac" que consta en el expediente clínico estipulado por las partes[,] el médico que participó fue el Dr. Fermín López quién había llegado a Intensivo a las 2:50 am.

65. Según declaró el Sr. Haddock Morales[,] el Dr. Eric Pérez es el internista que estaba atendiendo a la paciente y fue a quien la Sra. Llinás Rosario llamó el 20 de febrero de 2020 a las 10:00 pm.

66. Conforme explicó el Sr. Haddock Morales[,] cuando se activa la Clave Verde "Rapid Response" es para que venga el doctor de Sala de Emergencia. En este caso, vino de Sala de Emergencia el Dr. Fermín López Rivera a atender la situación.

67. Según el Sr. Haddock Morales[,] la Clave Verde "Cardiac" se activa cuando la paciente se va "flat", sin pulso.

68. El Sr. Haddock Morales declaró que, a base de la "Nota de Clave Verde Rapid Response y Cardiac", el Dr. López entuba a la paciente a las 3:08 am.

69. La Sra. Daisy Pedraza Montañez es enfermera hace 6 años.

70. Para febrero de 2020[,] la Sra. Pedraza Montañez trabajaba en la Sala de Cuidado Intensivo de Menonita Caguas.

71. La Sra. Pedraza conoce a la enfermera Sra. Llinás Rosario, al enfermero Sr. Haddock Morales y a la terapista respiratoria Sra. Rolmarie Colón García.

72. Según declaró la Sra. Pedraza, la Sra. Llinás Rosario y la Sra. Colón García no trabajan en Menonita Caguas.

73. Conforme expuesto por la Sra. Pedraza, en Menonita Caguas no hay un protocolo para pacientes con hipotensión.

74. Los pacientes con hipotensión se atienden dependiendo de lo que entienda el médico a cargo de la paciente.

75. La Sra. Pedraza no sabe si el Dr. Pérez es el médico privado de la Sra. Rivera.

76. La Sra. Pedraza no tiene un recuerdo independiente de lo que ella hizo cuando la Sra. Llinás Rosario activó la Clave Verde "Rapid Response" el 21 de febrero de 2020 a las 2:44 am. Generalmente, la Sra. Pedraza da medicamentos y realiza compresiones cuando participa de una Clave Verde.

77. Quien dirige la Clave Verde, en este caso, la Sra. Llinás Rosario es quien documenta lo que ocurre en la Clave Verde.

78. En la nota de Clave Verde del 21 de febrero de 2020 de la Sra. Llinás Rosario, ella documentó que la entubación de la Sra. Rivera fue a las 3:08 am.

79. El 21 de febrero de 2020 a las 5:30 am[,] se notificó al Dr. Eric Pérez de la Clave Verde.

80. El 21 de febrero de 2020 a las 7:00 am[,] el Dr. Eric Pérez firmó la hoja de notificación de la Clave Verde.

81. El 25 de febrero de 2020 a las 2:28 pm[,] la neuróloga Dra. Naggai Y. González Segarra confirmó la muerte cerebral de la Sra. Rivera.

82. El 26 de febrero de 2020 a las 7:37 am[,] el Dr. Edgardo Cartagena declaró y certificó la muerte de la Sra. Rivera.

83. El Dr. Soto del Cueto documentó la "Nota de Muerte" de la Sra. Rivera el 26 de febrero de 2020 a las 9:00 am.

84. La Dra. Elizabeth A.M. Frost fue cualificada como experta de la parte demandante en Anestesiología y Cuidado Médico Post-Anestésico.

85. La Dra. Frost reconoció que ella no es perita en Enfermería ni en Terapia Respiratoria.

86. El informe pericial que la Dra. Frost suscribió con fecha del 17 de noviembre de 2022[,] y que fue admitido en evidencia como exhibit 2 por estipulación[,] está fundamentalmente dirigido a las actuaciones y omisiones imputadas al anestesiólogo Dr. López Avilés.

87. La Dra. Frost no puede establecer si la aspiración de la Sra. Rivera ocurrió durante la primera o la segunda intervención quirúrgica del 19 de febrero de 2020.

88. La Dra. Frost entiende que la agitación que mostró la Sra. Rivera inmediatamente antes y después de la auto extubación el 19 de febrero de 2020 estaba relacionada con hipoxia.

89. Para la Dra. Frost[,] los síntomas que presentó la Sra. Rivera fueron exactamente los mismos que los de Mendelson Syndrome o neumonitis química.

90. Indicó la Dra. Frost que en este caso el Dr. López Avilés se desvió del estándar de cuidado al no dar antiácidos a la Sra. Rivera de forma profiláctica antes de la cirugía. Esta desviación resultó en que la Sra. Rivera aspirara contenido gástrico y desarrollara una neumonitis química.

91. Para la Dra. Frost, el Dr. López Avilés se apartó del estándar de cuidado al ordenar la administración de Zofrán a la Sra. Rivera cuando tal medicamento no es un antiácido, sino que es un medicamento para evitar náuseas y vómitos.

92. De igual forma, opinó la Dra. Frost que el Dr. López Avilés falló al no realizar un examen físico a la Sra. Rivera luego de que ella se auto extubó; y al no ordenar una prueba de gases arteriales, entubación ni placa de pecho, entre otras medidas.

93. Para la Dra. Frost[,] la muerte de la Sra. Rivera se hubiera evitado si ella hubiese recibido antiácidos profilácticamente y si hubiese sido adecuadamente tratada por los médicos en "Recovery Room".

94. La Dra. Frosf opinó, además, que el eventual arresto cardiorrespiratorio de la Sra. Rivera en Intensivo no fue reconocido ni tratado de forma oportuna de conformidad con el estándar de cuidado.

95. Para rendir tal opinión, la Dra. Frost no revisó ni solicitó el Protocolo de Activación u Manejo de Clave Verde "Rapid Response" y "Cardiac" vigente en Menonita Caguas para febrero de 2020.

96. Según su informe pericial, el Dr. Pérez, como médico primario, no estaba adiestrado para manejar circunstancias como las que le fueron notificadas por la enfermera Sra. Llinás Rosario el 21 de febrero de 2020 a las 10:00 pm y él debió haber llamado a alguien con más conocimiento como el médico de Sala de Emergencia, un intensivista o un anestesiólogo o solicitarle a la enfermera que lo hiciera.

97. La Dra. Frost no sabe cuál es la especialidad ni preparación del Dr. Eric Pérez.

98. La Dra. Frost no consideró el Protocolo de ACLS para rendir su opinión.

99. El Sr. Ortiz Cáez y la Sra. Rivera Cruz se casaron en 1971 y ambos son los padres de los codemandantes Richy Nelson Ortiz Rivera, Santos Javier Ortiz Rivera, Awilda Ortiz Rivera y Edgar Ortiz Rivera, todos mayores de edad. El Sr. Ortiz Cáez y la Sra. Rivera no tienen otros hijos.

100. La Petición de Declaratoria de Herederos Ab Intestato de Rosa Delia Rivera Cruz, Ex Parte con Cándido Ortiz Cáez como Peticionario y Civil Núm. CG2024CV01182 fue presentada el 8 de abril de 2024.

101. El 23 de mayo de 2024[,] se dictó Resolución en el caso antes identificado en la cual se declararon únicos y universales herederos de la causante Rosa Delia Rivera Cruz a sus hijos Richy Nelson Ortiz Rivera, Awilda Ortiz Rivera, Edgar Ortiz Rivera, Santos Javier Ortiz Rivera y a su viudo Cándido Ortiz Cáez en la cuota viudal usufructuaria, sin perjuicios de terceros, a no ser que se trate de herederos forzosos. Dicha Resolución obra en autos desde el 29 de mayo de 2024 cuando el caso quedó sometido para adjudicación.[22]

En la *Sentencia* apelada, el foro de instancia puntualizó que la parte apelante no incluyó en la demanda al doctor Soto del Cueto, a quien le había confiado de primera instancia su salud y en cuya relación médico-paciente el Hospital Menonita de Caguas entró incidentalmente en la cirugía. Asimismo, hizo constar que las causas de acción que la parte apelante pudo haber presentado contra el doctor Soto del Cueto, así como los otros médicos que atendieron a la señora Rivera Cruz, estaban prescritas. Por otra parte, enfatizó que la parte apelante no refutó las defensas afirmativas del Hospital Menonita, respecto a los médicos que intervinieron con la paciente entre el 19 y 26 de febrero de 2020. Igualmente, determinó que la parte apelante no probó que el doctor Soto del Cueto, ni algún otro médico que atendió a la señora Rivera Cruz, fueran empleados del referido hospital para la fecha de los hechos. Finalmente, el foro primario concluyó que, conforme a la prueba presentada, la parte apelante no demostró mediante preponderancia de la prueba que los daños sufridos se debieron con mayor probabilidad a la negligencia imputada y que la relación causal entre el daño sufrido y el acto negligente no se establece a base de una mera especulación o conjetura. Dado a su conclusión,

---

[22] Apéndice I del recurso, a las págs. 10-19.

añadió que se hacía innecesario resolver la procedencia de la reclamación de la causa de acción heredada.

Insatisfechos con lo resuelto, el 28 de febrero de 2025, la parte apelante incoó un recurso de *Apelación* en el cual esbozó la comisión de los siguientes cuatro (4) errores:

PRIMER ERROR:

Erró el TPI al declarar sin lugar la demanda, en contra del peso abrumador de la evidencia, al dictaminar que la parte demandante no cumplió con el estándar de prueba necesario para encontrar al codemandado Hospital Menonita Caguas incurso en responsabilidad civil extracontractual, no empece a que el Hospital demandado estipuló la admisibilidad y el contenido del informe de la perito de negligencia de la parte demandante y no presentó prueba alguna en contrario, y que el TPI, en ausencia de una determinación de falta de credibilidad, acogió las opiniones de negligencia de la perito de la parte demandante como parte de las determinaciones de hechos que dan base a su dictamen, sin que se presentara prueba alguna para refutar la evidencia incontrovertida de la causalidad entre el daño sufrido y el acto negligente y de impericia médica y hospitalaria.

SEGUNDO ERROR:

Erró el TPI al dictaminar equivocadamente que no hay responsabilidad del codemandado Hospital Menonita Caguas por los actos u omisiones de los médicos que atendieron a la Sra. Rivera durante su admisión al referido Hospital los días 19 al 21 de febrero de 2020, bajo el fundamento de que no son empleados del Hospital y no son parte del pleito, en contravención con la doctrina de responsabilidad vicaria establecida por nuestro Tribunal Supremo en Márquez Vega y. Martínez Rosado, 116 D.P.R. 397, 403 (1985).

TERCER ERROR:

Erró el TPI al actuar con prejuicio y parcialidad y cometer error manifiesto en el análisis efectuado de la prueba, al no imponerle responsabilidad al Hospital Menonita Caguas por la negligencia incontrovertida de su personal de enfermería y terapia respiratoria, exclusivamente a base de la falta de revisión de la perito de la parte demandante de los protocolos ACLS del hospital y su alegada falta de expertise en enfermería, en ausencia de prueba y sin determinación alguna de cómo ello rebatía la opinión de negligencia de la perito, admitida por el propio hospital demandado.

CUARTO ERROR:

Erró el TPI al no aplicar la presunción de la Regla 304(5) de Evidencia sobre evidencia adversa, a la prueba testifical y documental anunciada por el Hospital Menonita Caguas, consistente en el testimonio de los enfermeros del Hospital, el perito Dr. Miguel Marrero y el Protocolo ACLS del Hospital, habiendo optado dicha parte no presentar dicha prueba ni evidencia alguna durante el Juicio.

El 28 de febrero de 2025, compareció la parte apelante para acreditar el cumplimiento con nuestra *Resolución* del 4 de marzo de 2025. Luego, el 10 de marzo de 2025, compareció la parte apelante para presentar la transcripción de la prueba oral.

Luego de varios incidentes innecesarios pormenorizar, el 24 de marzo de 2025, la parte apelante presentó una *Moción sometiendo transcripción de prueba oral corregida.* De ahí, el 16 de abril de 2025, la parte apelante presentó su *Alegato Suplementario.* Por su parte, el 16 de mayo de 2025, la parte apelada presentó el *Alegato de la parte apelada.* Habiéndose perfeccionado el recurso ante nos, procederemos a exponer el derecho aplicable.

I

## A. Recurso de Apelación

La Regla 52.2 (a) de Procedimiento Civil dispone que los recursos de apelación tienen que presentarse dentro de un término jurisdiccional de treinta (30) días, desde el archivo en autos de copia de la notificación de la sentencia recurrida. [23] Como es conocido, un plazo jurisdiccional es de carácter fatal. Entiéndase, que no admite justa causa, es improrrogable y que su incumplimiento es insubsanable.[24] Ello, puesto a que la correcta notificación de una sentencia es una característica imprescindible del debido proceso judicial.[25]

Como corolario de lo anterior, la Regla 13(A) del Reglamento de este Tribunal establece que:

> Las apelaciones contra sentencias dictadas en casos civiles por el Tribunal de Primera Instancia, se presentarán dentro del término jurisdiccional de treinta días contados desde el archivo en autos de una copia de la notificación de la sentencia.
>
> [...].[26]

---

[23] 32 LPRA Ap. V, R. 52.2 (a).
[24] *Martínez, Inc. v. Abijoe Realty Corp.*, 151 DPR 1, 7 (2000); *Arriaga v. FSE*, 145 DPR 122, 131 (1998); *Loperena Irizarry v. ELA*, 106 DPR 357, 360 (1977).
[25] *Rodríguez Mora v. García Lloréns*, 147 DPR 305, 309 (1998).
[26] 4 LPRA Ap. XXII-B, R. 13 (A).

No obstante, lo anterior, el término de treinta (30) días, para acudir en alzada, puede quedar interrumpido mediante la presentación oportuna de una moción de reconsideración fundamentada.[27] En tal caso, el curso del término para apelar comienza a partir del archivo en autos de la copia de la notificación de la resolución que resuelve la moción.[28] Esto, a pesar de que la moción se haya declarado sin lugar.

De otra parte, precisa señalar que en grado de apelación, la tarea principal del Tribunal de Apelaciones es examinar como los tribunales inferiores aplican el derecho a los hechos particulares de cada caso, y si abusaron de su discreción.[29] El foro apelativo no debe pretender administrar ni manejar el trámite regular de los casos ante el foro primario.[30] Así, pues, si las determinaciones del tribunal no están desprovistas de base razonable ni perjudican los derechos de una parte, debe prevalecer el criterio del juez de instancia.[31] Por ello, se ha establecido que los foros apelativos no deben intervenir con las facultades discrecionales del tribunal de instancia, a menos que se demuestre que: (i) actuó con perjuicio o parcialidad; (ii) abusó de su discreción, o (iii) se equivocó en la interpretación o aplicación de cualquier norma procesal o derecho sustantivo. Igualmente, se permite intervenir para evitar un perjuicio sustancial.[32]

### B. Apreciación de la Prueba

Sabido es que el ejercicio discrecional de la apreciación de la prueba que lleva a cabo el tribunal de instancia y las determinaciones de hecho que realiza están revestidas de confiabilidad, por lo cual merecen respeto y deferencia.[33] A esos

---

[27] 32 LPRA Ap. V, R. 47.
[28] *Íd.*
[29] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 707 (2013); *Sierra, Secretario del Trabajo v. Tribunal Superior*, 81 DPR 554, 572 (1958).
[30] *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434 (2013).
[31] *Sierra, Secretario del Trabajo v. Tribunal Superior,* supra*,* a la pág. 572.
[32] *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194, 210 (2023).
[33] *Argüello v. Argüello*, 155 DPR 62, 79 (2001), citando a *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987); *Trinidad v. Chade*, 153 DPR 280, 291 (2001).

efectos, la valoración que lleva a cabo el foro primario se presume correcta, toda vez que es quien tiene la oportunidad de ver, escuchar y valorar las declaraciones de los testigos.[34] En consecuencia, cuando el Tribunal de Apelaciones de enfrenta a la tarea de revisar las determinaciones del foro de instancia, no debe intervenir con las determinaciones de hechos, con la apreciación de la prueba, ni con la adjudicación de credibilidad efectuadas por el mismo, excepto en aquellas situaciones en que se demuestre que este último: (i) actuó con prejuicio o parcialidad; (ii) incurrió en un craso abuso de discreción, o, (iii) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo.[35] Ello, puesto que el referido tribunal tiene ante sí expedientes mudos e inexpresivos.[36] En mérito de lo anterior, se ha entendido que, en ausencia de la transcripción de la prueba, el Tribunal de Apelaciones no cuenta con los elementos para descartar la apreciación fundamentada que realizó el foro primario.

Por otra parte, en lo que respecta a la prueba pericial, a los foros apelativos se les concede amplia discreción para evaluar la misma.[37] De manera que, "tenemos plena libertad de adoptar nuestro propio criterio en la apreciación de la prueba pericial. Incluso, podemos descartarla, aunque resulte técnicamente correcta".[38] Lo anterior, implica una excepción a la norma de deferencia hacia los tribunales de primera instancia, reiterada con firmeza por nuestro Alto Foro.[39] Siendo asi las cosas, los tribunales

---

[34] *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *Meléndez v. El Vocero de PR*, 189 DPR 123, 142 (2013); *Pueblo v. Santiago*, 176 DPR 133, 148 (2009); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

[35] *González Hernández v. González Hernández*, 181 DPR 746, 776 (2011); *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000); *Pueblo v. Irizarry*, 156 DPR 780, 789 (2002); *Pueblo v. Maisonave*, 129 DPR 49, 62-63 (1991).

[36] *Ramírez Ferrer v. Conagra Foods PR*, supra, a la pág. 811.

[37] *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 495 (2022).

[38] *Íd.*, citando a *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 297 (2006). (Cita depurada).

[39] *Cruz Flores et al. v. Hosp. Ryder et al.*, supra, a la pág. 495.

revisores tienen la potestad de evaluar la prueba pericial según lo estimen prudente.[40]

## C. Daños y Perjuicios

El Artículo 1802 del Código Civil de Puerto Rico de 1930 (Código Civil de 1930) le impone el deber a toda persona de no causar daño a otra mediante un acto u omisión culposa o negligente.[41] A su vez, el referido artículo establece la obligación de reparar los daños causados en los que medie culpa o negligencia.[42] Ahora bien, para que surja la responsabilidad civil extracontractual al amparo del Artículo 1802, deben concurrir los siguientes tres (3) elementos: (i) un daño, (ii) una acción u omisión negligente o culposa y, (iii) la correspondiente relación causal entre ambos.[43]

El concepto *culpa* del Artículo 1802 es infinitamente abarcador, tanto como lo suele ser la conducta humana. A esos efectos, la culpa debe evaluarse con amplitud de criterio.[44] La culpa o negligencia se ha definido como la falta del debido cuidado al no anticipar y prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias.[45] Entiéndase que, para que ocurra responsabilidad, la persona debe de haber omitido prever las consecuencias de determinada acción o inacción.[46] Por su parte, el daño es "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra".[47]

Es menester enfatizar que, en nuestro ordenamiento jurídico, la relación causal que debe existir entre la acción u omisión culposa

---

[40] *Cruz Flores et al. v. Hosp. Ryder et al.*, supra, a la pág. 495.
[41] 31 LPRA sec. 5141 (derogado).
[42] *Íd.*
[43] *Rivera v. S.L.G. Díaz*, 165 DPR 408, 421 (2005).
[44] *Rivera v. S.L.G. Díaz*, supra, a la pág. 422; *Santini Rivera v. Serv. Air, Inc.*, 137 DPR 1, 8 (1994); *Reyes v. Sucn. Sánchez Soto*, 98 DPR 305, 310 (1970).
[45] *Rivera v. S.L.G. Díaz*, supra, a la pág. 421; *Ramos v. Carlo*, 85 DPR 353, 358 (1962).
[46] *Montalvo v. Cruz*, 144 DPR 748, 756 (1998).
[47] *López v. Porrata Doria*, 169 DPR 135, 151 (2006).

o negligente y el daño se rige por la doctrina de la causalidad adecuada, la cual propone que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general".[48] Ello, implica que la ocurrencia del daño debe ser previsible dentro del curso normal de los acontecimientos.[49] Consecuentemente, recae sobre la parte que solicita ser indemnizada el deber de establecer, mediante preponderancia de la prueba, todos los elementos de la causa de acción por daños y perjuicios.[50]

### D. Impericia Médica

Es norma harta conocida que, en nuestro ordenamiento jurídico, la responsabilidad civil por impericia médica emana del Artículo 1802 del Código Civil de 1930.[51] Es por ello que, para poder imponer responsabilidad a un médico por haber incurrido en actos de mala práctica es indispensable que concurran los requisitos siguientes: (i) un daño sufrido; (ii) un acto u omisión culposo o negligente, y (iii) nexo causal entre el daño y la presunta acción culposa o negligente.[52] Además, habrá que tener presente que se ha establecido una presunción de que el médico ejerció un grado razonable de cuidado y que el tratamiento brindado fue el adecuado. Por consiguiente, no se podrá presumir la negligencia del médico por el mero hecho de que el paciente haya sufrido un daño o por que el tratamiento brindado no fue exitoso.[53]

De otra parte, a la hora evaluar si el médico incurrió en mala práctica, será necesario evaluar si el médico brindó al paciente aquella atención que "satisface las exigencias profesionales

---

[48] *Colón, Ramírez v. Televicentro de P.R.*, 175 DPR 690, 707 (2009).
[49] *López v. Porrata Doria*, supra, a la pág. 152.
[50] *SLG Colón-Rivas v. ELA*, 196 DPR 855, 864 (2016).
[51] 31 LPRA sec. 5141 (derogado). *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 486-487 (2022).
[52] *López v. Dr. Cañizares*, 163 DPR 119, 132 (2004).
[53] *Ramos, Escobales v. García, González*, 134 DPR 969, 975 (1993).

generalmente reconocidas por la propia profesión médica".[54] Lo anterior, teniendo presente los modernos medios de comunicación y enseñanza, el estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina.[55] Para que el tribunal pueda hacer una justa evaluación de cuáles son las prácticas de cuidado y conocimiento, generalmente reconocidas por la profesión médica, la parte que promueve la acción contra el médico deberá establecerlas mediante prueba pericial.[56] A su vez, deberá evidenciar, mediante preponderancia de prueba, que el médico, en efecto, incumplió con esas prácticas, y que ello fue lo que ocasionó el daño sufrido.[57] Solo así, podrá derrotar la presunción de corrección a favor del médico.[58] Establecido lo anterior, se hace claro que, para rebatir la referida presunción, no se podrá descansar en una mera posibilidad de que el daño fue a consecuencia de que el médico infringió sus responsabilidades profesionales. Sabido es que la causalidad no se puede establecer por especulaciones o conjeturas.[59]

Será necesario, además, que el juzgador tenga en cuenta que a los médicos se les reconocen amplia discreción en el juicio profesional que imparten al momento de diagnosticar y tratar al paciente.[60] A esos efectos, el "médico no incurre en responsabilidad civil si el tratamiento que le brinda a su paciente, aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica".[61]

### E. Responsabilidad de los Hospitales en Casos de Impericia Médica

Es menester destacar que "hoy es una incuestionable realidad que una persona que requiere atención médica tiene la alternativa

---

[54] *Pérez Torres v. Bladuell Ramos,* 120 DPR 295, 302 (1988).
[55] *López v. Dr. Cañizares,* supra, a la pág. 133.
[56] *Rodríguez Crespo v. Hernández,* 121 DPR 639, 650-651 (1988).
[57] *Medina Santiago v. Vélez,* 120 DPR 380, 385 (1988).
[58] *Rodríguez Crespo v. Hernández,* supra, a la pág. 650.
[59] *López v. Dr. Cañizares,* supra, a la pág. 135.
[60] *Ramos, Escobales v. García, González,* supra, a la pág. 975.
[61] *López v. Dr. Cañizares,* supra, a la pág. 134.

de elegir entre la oficina de un médico privado o recurrir directamente a una institución hospitalaria".[62] A tales efectos, el Estado Libre Asociado de Puerto Rico ha propuesto una alta regulación respecto a la responsabilidad por parte de los hospitales, en relación a los pacientes y los actos de mala práctica profesional ocurridos dentro de sus facilidades.[63] Siendo así, "nuestro derecho vigente exige que los hospitales ejerzan el cuidado y las medidas previsoras que un hombre prudente y razonable".[64]

De igual forma, nuestro más Alto Foro ha razonado que los hospitales "deben ejercer el cuidado y las medidas previsoras que una persona razonablemente prudente desplegaría ante determinadas situaciones, utilizando como criterio la buena práctica generalmente reconocida por la profesión".[65] No obstante, la referida responsabilidad de los hospitales no es absoluta.[66] Ello, puesto a que los hospitales no tienen la obligación de prever todo peligro que pueda surgir.[67] Por tal razón, la prevención que deben ejercer los hospitales "no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad sino a aquel que llevaría a una persona prudente a anticiparlo".[68]

Por su parte, en casos en los cuales el daño sea causado por un empleado del hospital, dicha entidad responderá solidariamente con el empleado por razón de la responsabilidad vicaria consagrada en el Artículo 1803 del Código Civil de 1930, hoy derogado.[69] Particularmente, el aludido Artículo 1803 establece que "responden los dueños y directores de un establecimiento o empresa respecto de los perjuicios causados por los empleados en el servicio que ofrecen

---

[62] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 487.
[63] *Íd.*
[64] *Blás v. Hosp. Guadalupe*, 146 DPR 267, 323 (1998).
[65] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a las págs. 487-488.
[66] *Íd.*, a la pág. 488.
[67] *Íd.*
[68] *Blás v. Hosp. Guadalupe*, supra, a la pág. 324, citando a *Hernández v. La Capital*, 81 DPR 1031, 1038 (1960). (Cita depurada).
[69] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 488.

o con ocasión de su función".[70] Asimismo, es norma reiterada en nuestros tribunales que una institución hospitalaria podría responder vicariamente por actos de impericia médica que comete un médico, no empleado del hospital, cuando la institución le concedió el privilegio de utilizar sus instalaciones para atender a sus pacientes privados.[71]

Cónsono con lo anterior, la responsabilidad de los hospitales se divide en cuatro (4) posibles escenarios, una vez se reconozca la relación jurídica existente entre el médico y el hospital. En *primer lugar*, los hospitales deberán responder vicariamente por las acciones u omisiones de los médicos que forman parte de sus empleados.[72] En *segundo lugar*, también responderán por aquellos médicos, "que, aunque no forman parte de su fuerza laboral, son parte de la facultad o staff, encontrándose disponibles para consultas de otros médicos".[73] En *tercer lugar*, igualmente responderán, vicariamente, en casos de impericia médica por los médicos que pertenecen a concesionarios de franquicias exclusivas que prestan servicios al hospital.[74]

Por otro lado, en *cuarto lugar*, los hospitales responden por aquellos médicos que, sin ser empleados, gozan de privilegios en referida institución.[75] Sin embargo, en el caso antes citado, en el cual la víctima de impericia médica es paciente privado del médico con privilegios, "el hospital solo responde por su propia negligencia y no vicariamente".[76] Para esos casos, se ha reconocido la responsabilidad de los hospitales por los actos negligentes de médicos, a quienes estos han concedido el privilegio de utilizar sus

---

[70] 31 LPRA sec. 5142 (derogado); *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 488.

[71] *Sagardia de Jesús v. Hosp. Aux. Mutuo*, 177 DPR 484, 513 (2009).

[72] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 489.

[73] *Íd.*

[74] *Íd.*

[75] *Íd.*, a las págs. 489-490.

[76] *Íd.,* a la pág. 490.

facilidades para atender a sus pacientes privados.[77] A esta doctrina se le reconoce como responsabilidad corporativa.[78] De manera que, el Tribunal Supremo ha establecido que "bajo esta doctrina, un hospital es responsable si no cumple con la obligación continua de velar por la salud de los pacientes y garantizar su seguridad y bienestar mientras está en el hospital".[79] A su vez, los hospitales tienen un deber indelegable de velar por el bienestar de los pacientes, a través de:

> (a) una cuidadosa selección de los médicos a quienes, en la forma que sea, les ha conferido el privilegio de utilizar sus facilidades; (b) exigiendo que dichos médicos se mantengan al día a través de cursos de mejoramiento profesional; (c) "manteniéndose al tanto" (monitoring) del trabajo de los referidos médicos e interviniendo, cuando ello sea posible, ante un acto obvio de impericia médica por parte de los mismos; (d) descontinuando el privilegio concedido ante repetidos o crasos actos de mala práctica por parte de uno de esos médicos; y (e) manteniéndose razonablemente al día en cuanto a los adelantos tecnológicos habidos.[80]

Acorde con lo anterior, nuestro más alto foro ha puntualizado que un hospital, el cual, en la práctica, no actúe conforme a los criterios antes esbozados, es responsable por complicidad del acto de impericia médica cometido en sus facilidades por el doctor con su paciente privado.[81] Esto, puesto a que la tendencia moderna va dirigida a "considerar que el deber de cuidado hacia el paciente no sólo corresponde a su médico sino también al hospital".[82]

Por otra parte, huelga reseñar que existen, además de los antes mencionados, otros dos (2) escenarios en los cuales un hospital responde por actos cometidos por quienes no son sus empleados, pero que forman parte del personal hospitalario. Uno de estos es cuando el paciente acude al hospital, y este lo refiere a un médico el cual no es empleado de la institución hospitalaria.[83] En

---

[77] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 488.
[78] *Íd.*
[79] *Íd.*, a la pág. 491.
[80] *Márquez Vega v. Martínez Rosado*, 116 DPR 397, 409-410 (1985).
[81] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 491.
[82] *Íd.*
[83] *Sagardia de Jesús v. Hosp. Aux. Mutuo*, supra, a la pág. 513.

estos casos, el hospital responde solidariamente.[84] Ello, puesto a que es el hospital quien lo refiere al médico en particular, y el paciente no participa en la elección del mismo.[85] El otro escenario, en cual un hospital puede responder por actos cometidos por quienes no son sus empleados, es cuando el paciente ha entendido, o le han dado la impresión, de que las personas que lo atienden son empleadas del tribunal, independiente de que lo sean o no.[86] Lo anterior, se ha catalogado dentro de lo que se conoce como la doctrina de responsabilidad aparente.[87]

Finalmente, es menester destacar que, aunque el Tribunal de Apelaciones, en un caso sobre impericia médica, está en posición de evaluar las determinaciones de hechos realizadas por el foro primario y llegar a sus propias conclusiones, aun cuando estas estén fundamentadas en prueba pericial y testimonial, también le debe gran deferencia al dictamen arribado por el tribunal de instancia.[88] Más aún, cuando las determinaciones de hecho están basadas en prueba testifical vertida en juicio. De manera que, el foro apelativo no debe intervenir, en estos casos, con las determinaciones de hecho realizadas por el tribunal de instancia, ni con la adjudicación de credibilidad, a menos que sea patente que medió pasión, perjuicio, parcialidad o error manifiesto en la apreciación de la prueba.[89]

### F. Regla 304 (5) de Evidencia

Conforme a las Reglas de Evidencia de Puerto Rico "una presunción es una deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción".[90] Particularmente, la Regla

---

[84] *Sagardia de Jesús v. Hosp. Aux. Mutuo*, supra, a la pág. 513.
[85] *Íd.*
[86] *Marquez Vega v. Martinez Rosado*, 116 DPR 397, 404 (1985).
[87] *Íd.*
[88] *López v. Dr. Cañizares,* supra, a la pág. 135.
[89] *Íd.,* a las págs. 135-336.
[90] Regla 301 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 301.

304 de Evidencia, regula las presunciones controvertibles.[91] En el inciso 5 de la referida regla, se reconoce como presunción controvertible que "[t]oda evidencia voluntariamente suprimida resultará adversa si se ofreciere".[92] Entiéndase, que si una parte anuncia un testigo, pero, luego, decide no utilizarlo, se activa la presunción de que su testimonio era adverso a la parte que lo propuso.[93] Sobre este particular, se ha razonado que, si una parte optar por no sentar a declarar a sus testigos debe ponerlos a disposición de las otras partes para que puedan entrevistarlos y decidir si los utilizarán en el juicio.[94] No obstante, lo anterior, la parte contra la cual se establece la presunción puede presentar prueba para demostrar la inexistencia del hecho presumido.[95] Ahora bien, "si la parte contra la cual se establece la presunción no ofrece evidencia para demostrar la inexistencia del hecho presumido, la juzgadora o el juzgador debe aceptar la existencia de tal hecho".[96]

III

Este Tribunal revisor tiene ante su consideración un recurso de Apelación mediante el cual la parte apelante nos invita a concluir que el Tribunal de Primera Instancia incidió al declarar *No Ha Lugar* la *Demanda* instada contra el Hospital Menonita, y al ordenar el archivo y sobreseimiento de la referida acción. En síntesis, los cuatro (4) señalamientos de error alzados en el recurso ante nos, versan sobre la inconformidad de la parte apelante, tanto en torno a la *Sentencia* recurrida, así como en cuanto a las determinaciones de hecho realizadas por el foro *a quo*, tras evaluar y aquilatar la prueba presentada. En vista de los errores planteados, esta Curia

---

[91] Regla 304 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 304.
[92] *Íd.*
[93] *Pueblo v. Rodríguez González*, 202 DPR 258, 274 (2019).
[94] R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 4ta ed., San Juan, Ed. Situm, 2015, a la pág. 171.
[95] Regla 302 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 302; R. Emmanuelli Jiménez, *op. cit.*, a la pág. 117.
[96] Regla 302 de Evidencia de Puerto Rico, *supra.*

se dispuso a examinar minuciosamente los autos ante nuestra consideración, al igual que la *Transcripción de la prueba oral corregida*, el *Alegato Suplementario* presentado por la parte apelante y el alegato en oposición. Así, pues, procedemos a discutir la procedencia de cada uno de los errores esgrimidos por la parte apelante.

En su *primer* error, la parte apelante esboza que el Tribunal de Primera Instancia incurrió en error al declarar sin lugar la demanda, luego de concluir que la parte apelada no cumplió con el estándar de prueba exigido para establecer la responsabilidad civil extracontractual del Hospital Menonita. Sostiene que el referido foro debía considerar que el Hospital Menonita estipuló la admisibilidad y el contenido del informe de la doctora Frost, y que no presentó prueba para rebatirlo. Aduce que, ante la ausencia de prueba contradictoria, el TPI debió determinar que la evidencia era suficiente para establecer la relación causal entre el daño alegado y la conducta que califican como negligente e impropia del personal médico y hospitalario. De otra parte, en su *segundo* error, sostiene que el tribunal apelado se apartó de la doctrina de responsabilidad vicaria al eximir al Hospital Menonita de responsabilidad por los actos y omisiones de los médicos tratantes, bajo el fundamento de que estos no eran empleados directos del Hospital ni figuraban como parte demandada en el pleito.

Por otro lado, la parte apelante afirmó en su *tercer* error que el foro primario actuó con parcialidad y cometió error al evaluar la prueba. Alegó que el referido foro falló al eximir al Hospital Menonita de responsabilidad por la conducta negligente del personal de enfermería y terapia respiratoria, basándose únicamente en que el perito de la parte apelante no revisó los protocolos Advance Cardiovascular Life Support (ACLS) del Hospital Menonita y carecía de peritaje en enfermería. Acentuó que el foro *a quo* no contó con

prueba que contradijera los hallazgos de la persona perito, de forma que el juzgador de instancia le era forzoso imponer responsabilidad vicaria a la parte apelada. Más aún, cuando la parte apelada estipuló el informe preparado doctora Frost.

En consideración a que los aludidos primeros tres (3) errores están íntimamente relacionados, los atenderemos de manera conjunta.

Según relatamos anteriormente, el caso del título inició cuando la parte apelante presentó una *Demanda* en contra del Hospital Menonita y de Anestesia del Caribe, entre otras partes desconocidas las cuales nunca se identificaron y/o fueron emplazadas, sobre daños y perjuicios e impericia médica por los actos de mala práctica profesional alegadamente cometidos en la atención médica y hospitalaria de la señora Rivera Cruz, hoy fallecida. Es menester enfatizar que la parte apelante no incluyó en el pleito a ninguno de los médicos que intervinieron con la señora Rivera Cruz durante su estancia en el Hospital Menonita los días 19 al 26 de febrero de 2020, como tampoco incluyó al personal de enfermería que atendió a la paciente durante esos días.[97] Ello, pese a que la parte apelante incluyó en su *Demanda* alegaciones en contra del mencionado personal médico y hospitalario.

Tras varias incidencias procesales, innecesarias pormenorizar, se celebró el juicio en su fondo de la acción del título, el cual tuvo una duración de tres (3) días. En el *primer* día del juicio, la parte apelante informó al tribunal de instancia, en corte abierta, que había llegado a un acuerdo transaccional confidencial con Anestesia del Caribe.[98] Luego, durante el *segundo* día de juicio, se firmó el referido acuerdo, igualmente en corte abierta.[99] Así, pues,

---

[97] Véase Apéndice I del recurso, a las págs. 4-5.
[98] Transcripción del juicio en su fondo del 8 de abril de 2024, a las págs. 6-22.
[99] Transcripción del juicio en su fondo del 9 de abril de 2204, a las págs. 6-12.

durante el *tercer* día de juicio, a solicitud de la parte apelante, el tribunal de instancia, mediante una *Sentencia Parcial,* dio por desistido el pleito en contra del Anestesia del Caribe. En consecuencia, la única parte demandada que permaneció en este pleito fue el Hospital Menonita. De modo que, la controversia fundamental a ser considerada por el foro primario en este caso era si el Hospital Menonita incurrió en responsabilidad vicaria por los daños ocasionados a la señora Rivera Cruz a consecuencia de la impericia médica, presuntamente cometida por el personal médico y hospitalario de la referida institución.

Conforme reseñamos en nuestra previa exposición doctrinal, nuestro ordenamiento jurídico vigente requiere que los hospitales desplieguen el cuidado y las medidas previsoras de un hombre prudente y razonable frente a los actos de impericia médica cometidos en sus facilidades.[100] Ahora bien, dado a que no es posible que los hospitales prevean todo peligro imaginable, la responsabilidad de estos ante la mala práctica profesional no es absoluta.[101]

Establecido lo anterior, precisa acentuar que, en los casos en los cuales los daños son causados por un empleado, al hospital se le podrá imputar responsabilidad vicaria, conforme al Artículo 1803 del Código Civil de 1930, hoy derogado.[102] A esos efectos, probada la responsabilidad del empleado, el hospital deberá responder de manera solidaria con el empleado que efectuó los actos de mala práctica profesional.[103] Por otra parte, nuestro Tribunal Supremo ha razonado que los hospitales también podrán responder vicariamente por los actos de mala práctica que cometan los médicos que: (i) no

---

[100] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 487; *Blás v. Hosp. Guadalupe,* supra, a la pág. 323;

[101] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a las págs. 487-488; *Blás v. Hosp. Guadalupe,* supra, a la pág. 324

[102] 31 LPRA sec. 5142 (derogado).

[103] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 488.

son parte de fuerza laboral, pero que son parte de su facultad o staff, de forma que están disponibles para consulta de otros médicos; (ii) pertenecen a concesionarios de franquicias exclusivas que prestan servicios al hospital y (ii) gozan de privilegios en referida institución, sin ser empleados.[104]

En el presente caso, la parte apelante intentó, a través de la prueba oral y documental, probar que: (i) el doctor Soto del Cueto; (ii) la doctora Fernández Madero, y (iii) el doctor López Avilés; incurrieron en mala práctica profesional al atender a la señora Rivera Cruz en el Hospital Menonita. Sin embargo, de sus testimonios presentados en corte abierta se desprende que estos no eran empleados del hospital, si no que tenían privilegios en la institución.[105] Empero, según adelantamos, un hospital puede responder vicariamente por los actos de un médico que goza de privilegios en la institución, sin ser empleado. Ahora bien, se ha razonado que, en estos casos, un hospital solo será responsable, por complicidad del acto de impericia médica cometido por el médico privado, cuando se pruebe que no ha cumplido con su obligación continua de velar por la salud de los pacientes y de garantizar la seguridad y bienestar de estos mientras se encontraban en el hospital.[106] Sobre este particular, se ha subrayado que un hospital cumple con velar por el bienestar de los pacientes cuando, entre otras cosas: (i) selecciona de manera escrupulosa los médicos a los cuales le confiere privilegios en sus facilidades; (ii) requiere que sus médicos se mantengan al día mediante cursos de mejoramiento profesional; (iii) monitorea los trabajos de los médicos a los que les ha hecho tal concesión; (iv) descontinúa los privilegios de los

---

[104] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a las págs. 489-490.
[105] Transcripción de la Vista en su Fondo del 8 de abril de 2024, a las págs. 28-29; 54, y 70, respectivamente.
[106] *Cruz Flores et. al. v. Hosp. Ryder et. al.*, supra, a la pág. 491.

médicos que han cometido mala práctica, y (v) se mantiene al día con los adelantos tecnológicos.[107]

Luego de examinar cuidadosamente los autos ante nuestra consideración, así como *la Transcripción de la prueba oral corregida*, no se desprende que la parte apelante presentó algún tipo de prueba conducente a demostrar que el Hospital Menonita no hubiese cumplido con su deber de velar por aquellos pacientes que son atendidos por médicos que ostentan privilegios en la institución. De manera que, forzosamente concluimos que la parte apelante incumplió con el estándar de prueba requerido para este tipo de caso. Esto, puesto a que concentró sus esfuerzos en probar los actos la negligencia cometidos por parte de los médicos que atendieron a la señora Rivera Cruz, a pesar de que ninguno de ellos era parte demandada en la acción del título.

Por otro lado, en cuanto a los enfermeros que atendieron a la señora Rivera Cruz, sobre los cuales la parte apelante igualmente intentó probar que fueron negligentes en su intervención con la paciente, precisa señalar que el Hospital Menonita admitió en su *Contestación a Demanda* que estos eran empleados de la institución hospitalaria.[108] Ahora bien, según adelantamos, para poder imputarle responsabilidad vicaria a un hospital, es necesario, como primer paso, probar la negligencia del empleado. De un minucioso examen de la prueba, en particular la prueba pericial, conforme nos autoriza nuestro ordenamiento jurídico vigente,[109] se desprende que la perito de la parte apelante se limitó a concluir que el personal de enfermería no actuó en el periodo de tiempo acordado ("in a timely fashion") sin indicar los estándares requeridos de forma fehaciente,

---

[107] *Márquez Vega v. Martínez Rosado*, supra, a las págs. 409-410.
[108] Apéndice del III del recurso, página 55, en el inciso 14.
[109] Véase *Cruz Flores et al. v. Hosp. Ryder et al.*, supra, a la pág. 495.

que demostraran deficiencias en el manejo del caso de la señora Rosa Rivera.

Puntualizamos de otra parte que, aunque es cierto que la parte apelada no presentó prueba a su favor, en nuestro ordenamiento jurídico vigente, en los casos de impericia médica, se ha establecido una presunción de que el personal médico ejerció un grado razonable de cuidado y que el tratamiento fue el adecuado. [110] Teniendo en cuenta lo anterior, a quien le corresponde presentar prueba para rebatir esa presunción y evidenciar que el personal médico fue negligente en su atención al paciente es a la persona que alegue que se incurrió en impericia médica. Es decir, a la parte demandante, y no así a la parte demandada.[111]

En cuanto al informe pericial de la doctora Frost, pese a que indisputablemente se estipuló su contenido, el cual sugería que, tantos los médicos como los enfermeros antes señalados fueron negligentes al intervenir con la señora Rivera Cruz,[112] huelga subrayar que, en los casos de impericia médica, no basta con alegar que el personal médico fue negligente.[113] Será necesario que se expongan cuáles son las exigencias profesionales generalmente reconocidas por la profesión médica, tomando en consideración los medios modernos de comunicación, el estado de la ciencia y la práctica prevaleciente de la medicina.[114] Además, se deberá evidenciar, mediante preponderancia de prueba, cómo el personal médico incumplió con las referidas prácticas.[115] Considerando lo anterior, aunque se desprende del informe de la doctora Frost las decisiones tomadas por los médicos y enfermeros que, en la opinión de la persona perito, propiciaron el deterioro de la condición de la

---

[110] *Rodríguez Crespo v. Hernández,* supra, a la pág. 650.
[111] *Ramos, Escobales v. García, González*, supra, a la pág. 975.
[112] Apéndice XIII del recurso, a las págs. 109-113.
[113] *Ramos, Escobales v. García, González*, supra, a la pág. 975.
[114] *López v. Dr. Cañizares*, supra, a la pág. 133.
[115] *Medina Santiago v. Vélez,* supra, a la pág. 385.

señora Rivera Cruz, no se estableció propiamente el estado de las ciencias y la práctica prevaleciente de la medicina. Esta, únicamente hizo referencia a dos (2) escritos académicos en las notas al pie de página del informe pericial. Por otro lado, aunque en su testimonio abundó en los actos que entendió que eran inconsistentes con las prácticas prevalecientes en la medicina, sus expresiones se basaron principalmente en su opinión y en su experiencia como anestesióloga.[116] Peor aún, pese a que arguyó que, cuando la paciente sufrió un arresto cardiaco, no fue atendida en un tiempo apropiado, según las prácticas prevalecientes, admitió en corte abierta que, para rendir su informe no contó con el protocolo de activación y manejo de clave verde "rapid response" y "cardiac" del Hospital Menonita.[117]

Ahora bien, aun si concluyéramos que tanto el informe pericial de la doctora Frost, así como su testimonio en corte abierta, cumplieron con establecer que el personal médico y hospitalario que atendió a la señora Rivera Cruz incumplió con las prácticas generalmente aceptadas por la profesión médica, esto no es suficiente para imputarle responsabilidad al hospital. Incluso, reconocemos que, en virtud de la doctrina de responsabilidad aparente, un hospital puede responder si el paciente de buena fe creyó que las personas que lo atendían eran empleadas del tribunal, independientemente de que estas lo hayan sido o no. [118] Ahora bien, según adelantamos, en un caso de responsabilidad vicaria, no bastaba con probar que los médicos y enfermeros fueron negligentes, había que evidenciar la negligencia del hospital en cuanto a su supervisión sobre el personal hospitalario, lo cual evidentemente no se hizo. Particularmente, puesto a que se

---

[116] Transcripción del juicio en su fondo del 9 de abril de 2024, a las págs. 63-118.
[117] *Íd.*, a las págs. 107-109.
[118] *Marquez Vega v. Martinez Rosado*, supra, a la pág. 404.

demostró que los médicos que atendieron a la paciente tenían privilegios en el hospital.

Por todo lo expuesto, concluimos que los primeros tres (3) errores esgrimidos por la parte apelante no se cometieron.

Finalmente, en su *cuarto* error, los apelantes sostienen que el tribunal de instancia erró al no aplicar la presunción de evidencia adversa dispuesta en la Regla 304(5) de Evidencia. Alegan que dicha norma debía operar en contra del Hospital Menonita, toda vez que la referida parte anunció como prueba el testimonio de los enfermeros, el del perito, el doctor Miguel Marrero, y el documento del Protocolo ACLS del Hospital, pero no presentó esta prueba durante el juicio. Aducen que, ante la omisión injustificada de esa prueba anunciada, procedía que el TPI presumiera su carácter adverso.

De entrada, puntualizamos que la aplicación de la Regla 304 (5) de Evidencia es una cuestión de manejo del caso, por lo que, a falta de prueba de que la determinación tomada por el tribunal de instancia estaba desprovista de base razonable y/o que perjudicó los de derecho de alguna de las partes, debemos sostener el criterio del juzgador de instancia.[119] A su vez, precisa señalar que en el foro primario únicamente se solicitó aplicar la referida presunción en cuanto a los testimonios de los enfermeros, no así en cuanto al testimonio del perito Miguel Marrero o al Protocolo ACLS del Hospital.[120] Sabido es que esta Curia no conocerá ni resolverá ninguna cuestión que no haya sido planteada o resuelta por el tribunal que emitió la sentencia o resolución que se ha apelado".[121] A esos efectos, nos limitaremos a discutir si procedía aplicar la aludida regla en cuanto a los testimonios de los enfermeros.

---

[119] *Sierra, Secretario del Trabajo v. Tribunal Superior,* supra, a la pág. 572.
[120] Transcripción de la vista en su fondo del 10 de abril de 2024, a las págs. 130-132.
[121] *Autoridad Sobre Hogares v. Sagastivelza,* 71 DPR 436, 439 (1950).

De ordinario, cuando una parte anuncia un testigo y, posteriormente, decide no utilizarlo, conforme a la Regla 304 (5) de Evidencia, debe activarse la presunción de que el testimonio voluntariamente suprimido era adverso para la parte que lo propuso.[122] Ahora bien, en este caso, la razón por la cual la parte apelada optó por no presentar los testimonios de los enfermeros Haddock Morales y Pedraza Montañez fue porque la parte apelante los había sentado a declarar como testigos hostiles, de forma que, entendió que sentarlos nuevamente resultaría en prueba acumulativa.[123] En vista de lo anterior, entendemos que el foro primario no incidió al no aplicar la presunción de la Regla 304 (5) de Evidencia. Por lo anterior, resolvemos que el *cuarto* error tampoco fue cometido.

Considerando todo lo antes expuesto, y en vista de que, en casos de impericia médica, este foro apelativo le debe gran deferencia al dictamen del tribunal de instancia, en específico, cuando las determinaciones de hecho están basadas en prueba testifical vertida en juicio,[124] nos resulta forzoso confirmar la sentencia ante nuestra consideración.

IV

Por los fundamentos que anteceden, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[122] *Pueblo v. Rodríguez González*, supra, a la pág. 274.
[123] Transcripción de la Vista en su Fondo del 10 de abril de 2024, a las págs. 454-455, en las líns. 22-25 y 1-3, respectivamente.
[124] *López v. Dr. Cañizares,* supra, a la pág. 135.